# WESTERN BUSE TELEPHONE COMPANY AND OTHERS v. NORTHWESTERN BELL TELEPHONE COMPANY.[1]

April 7, 1933.

No. 29,210.

[1]Reported in 248 N. W. 220.

526

*E. A. Prendergast* and *A. J. McBean,* for appellant.
*Roger L. Dell* and *Rolf P. Jacobson,* for respondents.

WILSON, CHIEF JUSTICE.

The Northwestern Bell Telephone Company has appealed from a judgment.

This is a proceeding initiated under G. S. 1923 (1 Mason, 1927) §§ 4638, 4641, by eight rural telephone companies, seeking, at the hands of the railroad and warehouse commission, reduced rates on switching charges in relation to their physical connection with appellant's local exchange in Fergus Falls. Appellant appeared and participated in the proceedings, and the irregularity as to notice, answer, and reply is not now important.

Appellant owns a local exchange in Fergus Falls having about 2,200 local phones, long distance lines, and three rural telephone lines. The rural community is served largely by 17 rural telephone companies, which own 33 rural lines having 465 phones thereon. Appellant's exchange plant has a value of about $169,046. The rural companies own 344 miles of rural pole lines and 593 miles of aerial wire, and their property is given a value of $70,879. The appellant claims that the value of that portion of its exchange properties assigned to rural companies' switching services is $7,926, while the rural companies claim such value is but $2,264. Neither do the parties agree as to the proportion of jointly used property. These rural companies have no switchboard and employ no operators. Each of their telephone circuits is connected at the city limits at Fergus Falls with a circuit from appellant's plant owned by it and through which the rural lines connect with appellant's switchboard. Through the switchboard, connections are made between the lines of the various rural telephone companies and between the rural lines and the city lines. A patron on a rural line may call

other patrons on the same line without going through appellant's switchboard; but otherwise he must make connection through the switchboard. The switchboard also furnishes the only way by which telephone users, aside from those on a particular rural line, may reach the patrons on the rural lines. The switching service also gives the rural patrons access to the toll lines and vice versa.

There was a time when the rural companies were required to pay an annual switching charge per phone on their lines of three dollars, but since the war there has been an established annual price or rate of six dollars. This proceeding seeks to have a new rate, claiming the present one to be unreasonable, excessive, and discriminatory. This is met by a claim from the appellant that the reduction in the rate would be confiscatory.

Nine of the 17 rural telephone companies instituted a proceeding for the same purpose in December, 1929, resulting in an order involved in Dayton Rural Tel. Co. v. N. W. Bell Tel. Co. 188 Minn. 547, 248 N. W. 218.

On April 8, 1930, the other eight, the complainants herein, who had not been parties to said other proceeding, instituted this proceeding. Evidence of the parties herein was introduced, and on May 8, 1931, the commission made an order reducing the $6 rate to $3. This apparently rested on a finding that the net cost to appellant for such switching operation was $2.98 per telephone per year. This conclusion was reached by first finding that such cost to appellant was $5.85 to render the service, but that the rural companies were entitled to credits which offset all but $2.98.

Appellant appealed from the order of the commission to the district court, which, as required by statute, heard the matter upon the same evidence. The court made no specific findings, but merely found that the commission's order was lawful and reasonable. This appeal was from the judgment of affirmance.

Appellant's exchange at Fergus Falls is complete. Perhaps 95 per cent of the messages which pass through its switchboard travel over its own lines exclusively from one of its own subscribers to another. Perhaps 61 per cent of the messages which pass over the

rural lines are from one of their own subscribers to another. With appellant's contribution, with which we are here concerned, the rural companies have a complete system; but they do not own the switchboard which they use or any of the equipment used inside the city limits. Appellant provides the poles, wires, conduits, etc. which are used to bring the rural lines to its switchboard, a separate section of which is used for their termination, and appellant furnishes all the necessary housing facilities. With the equipment contributed by appellant both systems are complete, and they are connected merely by short trunks or circuits running from the rural section of the switchboard to the city section thereof in the same room. Appellant also furnishes necessary operators, who switch the calls which use the rural system exclusively as well as the calls which use only the town system or pass between the two systems. Obviously the appellant must furnish some service of a clerical and commercial nature. It is for such support from the appellant that the rural companies are required to pay a reasonable compensation.

■ At common law public utilities were and are required to furnish equal facilities to the public. But physical connection between telephone companies cannot be compelled at common law. State ex rel. Fletcher v. N. W. Bell Tel. Co. 214 Iowa, 1100, 240 N. W. 252. The right to do so rests entirely in statutory law. We have such a statute. G. S. 1923 (1 Mason, 1927) § 5296.

■ Reasonable compensation must be paid for such service. The railroad and warehouse commission is given power to prescribe a reasonable rate. G. S. 1923 (1 Mason, 1927) § 5291. Of course there would be no occasion to do so until an existing rate has been found to be unreasonable.

We are here interested in ascertaining appellant's cost per phone per year for this switching service which it gives the rural companies. If the reasonable cost is more than three dollars, the rate is illegal and confiscatory. The mere fact that a rate is nonconfiscatory does not indicate that it must be deemed to be just and reasonable. But any rate insufficient to constitute a reasonable

530

return on the value of the property used and the service furnished is confiscatory. Banton v. Belt Line Ry. Co. 268 U. S. 413, 423, 45 S. Ct. 534, 69 L. ed. 1020; Board of Commrs. v. New York Tel. Co. 271 U. S. 23, 31, 46 S. Ct. 363, 70 L. ed. 808.

We are concerned with confiscation, and whether proper rules are applied to the facts.

■ The statute provides that the commission's findings, when definitely made, shall be prima facie reasonable. That means no more, however, than to say that the order shall stand unless it is made to appear that the finding is not reasonably supported by the evidence.

The statute, G. S. 1923 (1 Mason, 1927) § 5308, however, contemplates in the first instance that the commission will make definite and specific findings as to the essential elements and facts to be determined and from which it is to arrive at the ultimate fact. All material facts should be separately and definitely stated. The same statute must also be and is construed as meaning that the appeal to the district court contemplates, when the question of confiscation is involved, that that tribunal will also make its findings as if it tried the case in the first instance. It can no longer be said to be the law that the order of the commission is final and conclusive under the statutory direction that it would be considered prima facie reasonable. The appellant is entitled to have the issue of confiscation submitted to a judicial tribunal for determination upon its own independent judgment as to both the law and the facts. There must be no conflict with the due process clause of the fourteenth amendment to the United States constitution. Ohio Valley Water Co. v. Ben Avon Borough, 253 U. S. 287, 40 S. Ct. 527, 64 L. ed. 908; Bluefield W. W. & I. Co. v. Public Service Comm. 262 U. S. 679, 43 S. Ct. 675, 67 L. ed. 1176; Lehigh Valley R. Co. v. Board of Public Utility Commrs. 278 U. S. 24, 49 S. Ct. 69, 73 L. ed. 161, 62 A. L. R. 805; City of Duluth v. Railroad & Warehouse Comm. 167 Minn. 311, 209 N. W. 10.

In this case the court failed to apply its own independent judgment as to the law and the facts. To do that it should have made

definite findings as to the facts and drawn its own conclusion as to the law. Findings must be made by the court as to the essential facts. Smith v. Illinois Bell Tel. Co. 282 U. S. 133, 51 S. Ct. 65, 75 L. ed. 255. Because of such failure on the part of the trial court the judgment will have to be reversed. It is desirable that complete findings be made in a case of this character. When that is done and the independent judgment of the court has been applied, the matter may have a more expeditious ending in case of appeal to this court. McCardle v. Indianapolis Water Co. 272 U. S. 402, 420, 47 S. Ct. 144, 71 L. ed. 316. See also Public Service Comm. v. Wisconsin Tel. Co. 289 U. S. 67, 53 S. Ct. 514, 77 L. ed. 670.

■ The parties have agreed for the purpose of this case that seven per cent constitutes a fair return upon the money invested. There is a controversy as to the value of the property and as to expenses incurred. Each of these questions carries subissues. There is no dispute as to the identity of the property involved.

Some of this plant consists of pole lines which carry only the wires which are used to connect the lines of the rural companies with the central office. This is of course devoted exclusively to service stations' service. In many instances, however, such wires are carried by the same poles which carry town system circuits and for part of the distance are carried in the same cables. Such property is jointly used. An apportionment of property jointly used must necessarily be made. A sound apportionment must be based upon use, termed traffic in the telephone business. The value of use is not shown by gross earnings. Minnesota Rate Cases, 230 U. S. 352, 459, 33 S. Ct. 729, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas. 1916A, 18. It is not necessary to adopt any arbitrary theory. Use can be determined by observation and actual count with satisfactory certainty. It will not do to attempt to make such apportionment on the basis of the relative number of circuits. The city exchange had 1,050 town circuits, and there were only 33 circuits running from the switchboard to the city limits. On such basis this would mean here a percentage of 96.95 and 3.05, respectively. But such an apportionment would rest upon the assump-

tion that the amount of switchboard required would depend upon the number of lines. We think not. We should look to the volume of traffic over the lines. All lines are not uniform in the production of work for the operator at the switchboard. They necessarily vary greatly. In this case there were nine switchboard positions; three were used for toll, five for local exchange, and one for the rural lines. The volume of traffic on 23 toll lines required three positions. The five local exchange positions had an average of 230 lines terminating on each position. The rural position had 36 lines terminating on it, of which 33 were the lines of rural companies and three were appellant's own rural lines. These lines carried an average of 14 telephones, while a town circuit carried usually but one or two telephones. The thing that makes expense in operation is the handling of calls. It also takes an operator longer to handle a call on a rural magneto board than on a board used for the local system. An actual inspection showed that about eight per cent of the total of nine positions was in fact used for the service station switching instead of three per cent. Neither joint property nor joint traffic expense can be apportioned on a per circuit basis. Circuits are of various lengths. Rural circuits here average about 2.2 miles in length, and the town circuits average about three-quarters of a mile in length. Many rural circuits necessarily pass in zones where the cost per circuit in construction and maintenance is higher. It cannot be assumed that all circuits are of equal cost or carry an equal expense of maintenance. Property that is jointly used should be apportioned on the basis of its relative use, which with a telephone company includes the volume of traffic. The operators' time spent in handling exchange and service station calls is to be determined by actual count.

The present Chief Justice of the United States Supreme Court said in the Minnesota Rate Cases, 230 U. S. 352, on page 433, 33 S. Ct. 729, 754, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas. 1916A, 18:

"We do not sit as a board of revision to substitute our judgment for that of the legislature, or of the commission lawfully constituted.

by it, as to matters within the province of either. San Diego Land & Town Co. v. Jasper, 189 U. S. 439, 446, 23 S. Ct. 571, 47 L. ed. 892, 896. * * * Here we have a general schedule of rates, involving the profitableness of the intrastate operations of the carrier taken as a whole, and the inquiry is whether the state has overstepped the constitutional limit by making the rates so unreasonably low that the carriers are deprived of their property without due process of law and denied the equal protection of the laws.

"The property of the railroad corporation has been devoted to a public use. There is always the obligation springing from the nature of the business in which it is engaged—which private exigency may not be permitted to ignore—that there shall not be an exorbitant charge for the service rendered. But the state has not seen fit to undertake the service itself; and the private property embarked in it is not placed at the mercy of legislative caprice. It rests secure under the constitutional protection which extends not merely to the title but to the right to receive just compensation for the service given to the public."

■ In 1921 the commission issued a pamphlet, exhibit M herein, prescribing among other things, pages 545 to 571, a method of determining the cost of service stations' switching, which is the precise question here involved. This pamphlet in establishing such formula goes into great detail and seems to set forth a logical method of separating the cost of providing plant and services for rural companies from the cost of operating the town exchange system. It seems to rest on the basis of use. The formula as contained in exhibit M contains no language making it applicable to the claim by the rural lines of credits as an offset as hereinafter discussed, and we take that fact to be the principal reason why the commission in its order herein concluded that "in view of the evidence of record" the formula in exhibit M is "improper for application in the instant case." There may be other reasons. New problems will always arise, and any set of rules can hardly be expected to meet all new problems. When the rules are found inadequate or obsolete they should not be followed. We know of no reason why the com-

534

mission could not disregard its own rules at will. Much of this formula however seems to provide a logical and sound method of procedure.

■ The statistician who testified for the complainants in at least some respects based his computations and opinions on official reports and assumed facts. This was not necessarily erroneous. But upon the questions of value and depreciation in such a case as this the rule is well established that the testimony by competent valuation experts who have recently examined the property and made estimates in respect to its actual condition is preferable to mere calculations based on averages and assumed probabilities. McCardle v. Indianapolis Water Co. 272 U. S. 400, 47 S. Ct. 144, 71 L. ed. 316; Pacific G. & E. Co. v. City and County of San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. ed. 1075.

Much in the work of the commission and in the successful operation of telephone companies must be based upon book analysis, and the expert for the complainants in this matter used such analysis for the foundation for some of his opinions. Statisticians must necessarily advise from book analysis. But when it comes to determining the value of property for rate-making purposes and the question of confiscation is involved, book analysis will ordinarily be insufficient. It alone is not a safe criterion. It may be considered for what it is worth. But obviously it does not go directly to the point. Such testimony carries little weight when compared to the testimony of reliable, competent witnesses who have made a physical inspection and examination. The best evidence available should be used.

■ The first step in arriving at the value of a telephone plant or any public utility is to ascertain its reproduction cost new, less depreciation. The reproduction cost means cost to the owner under the conditions which may be reasonably expected to exist if the property were to be replaced. Depreciation is deducted, as the theory is to make replacement with property equally as good. An interesting discussion is found in Idaho Power Co. v. Thompson (D. C.) 19 F. (2d) 547, 565. See also City of Knoxville v. Knox-

ville Water Co. 212 U. S. 1, 29 S. Ct. 148, 53 L. ed. 371; Railroad Comm. of Louisiana v. Cumberland Tel. & Tel. Co. 212 U. S. 414, 29 S. Ct. 357, 53 L. ed. 577. The depreciation to be taken into account in ascertaining the rate base is that diminution in the value of the property involved which takes place in the physical thing, and is ascertained by a physical inspection and examination of it. We are not concerned with a depreciation which has been overcome by repairs and replacements. Nor are we particularly concerned with the depreciation reserve which is a matter of book-keeping as distinguished from obsolescence and disintegration of physical assets. The company is entitled to any increase in the value of property since it was acquired; and if any of its property has shrunk in value since it was acquired the company must stand the loss. Past losses cannot be used to enhance the value of the property or to support a claim that rates for the future are confiscatory; and the law does not require the company to give up for the benefit of future subscribers any part of its accumulations from past operations. Profits of the past cannot be used to sustain confiscatory rates for the future. Board of Public Utility Commrs. v. New York Tel. Co. 271 U. S. 23, 31, and 32, 46 S. Ct. 363, 70 L. ed. 808. The fact that a utility is not a financial success is a reason for allowing a liberal return on the value of its property, but it does not make past losses an element to be considered in deciding what the base value is and whether the rate is confiscatory. Past deficits are not controlling. Galveston Elec. Co. v. City of Galveston, 258 U. S. 388, 42 S. Ct. 351, 66 L. ed. 678. The ascertainment of the value is not a matter of formulas, "but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts." Minnesota Rate Cases, 230 U. S. 352, 434, 33 S. Ct. 729, 754, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas. 1916A, 18. We are not unmindful of the fact that in determining the reasonableness of a rate or whether it is confiscatory each case must be determined on its own peculiar facts. In order for a rate to be reasonable it must be such as to assure confidence in the financial soundness of the utility and should be adequate, under

reasonably economic management, to maintain and support its credit in a manner commendable for one in its position in its field of operation. There are other elements that may be considered. Reproduction cost new less depreciation is not the sole guide. Brooklyn Borough Gas Co. v. Prendergast (D. C.) 16 F. (2d) 615, 624.

■ The complainants' expert witness, as we understand the record, deducted the depreciation reserve from the reproduction cost new and called the result the present fair value. Respondents call this depreciation reserve the amount "collected" from the patrons in the past for depreciation. This is not a correct statement. Nothing was collected as such; nor were any definite funds raised for that purpose. The depreciation reserve belongs to the company. It is not a trust fund in which the ratepayers or patrons have any interest. The past is history. The rate inquiry is as to the present and in contemplation of the future. Losses, like profits, fall upon the company, and prosper or shrivel and shrink as fate determines. Payments by the patrons are not contributions to depreciation nor to operating expenses nor to the capital of the company. Board of Public Utility Commrs. v. New York Tel. Co. 271 U. S. 23, 31, 32, 46 S. Ct. 363, 70 L. ed. 808; Illinois Bell Tel. Co. v. Moynihan (D. C.) 38 F. (2d) 77. Patrons of a telephone company pay for service. They do not pay for the property used to render it. The patron pays for the privilege of using the company's facilities for verbal communications. By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company. Funds in the company's hands, though received from its patrons, like property paid for out of moneys received for service, belong to the company, just as does that property purchased by it out of proceeds of its bonds and stocks. From the general revenue the money is assignable, presumably annually, to this depreciation reserve account on the books. It is a book entry. The "depreciation reserve" is the opposite side of the accounting entry for depreciation expense. When the latter is charged with depreciation expense the same item is credited to the depreciation reserve.

The rate must be based upon the present value of the property involved and not upon the company's investment. State ex rel. Southwestern Bell Tel. Co. v. Public Service Comm. 262 U. S. 276, 43 S. Ct. 544, 67 L. ed. 981, 31 A. L. R. 807. It therefore would seem to follow that the theory of deducting the depreciation reserve from the reproduction cost new is fallacious. Board of Public Utility Commrs. v. New York Tel. Co. 271 U. S. 23, 46 S. Ct. 363, 70 L. ed. 808. However, it is claimed by respondents that the later case of New York Tel. Co. v. Prendergast (D. C.) 36 F. (2d) 54, 65, sustains such theory. We doubt it. We are told, however, that that case is now pending in the United States Supreme Court. The decision as now written contains the statement [36 F. (2d) 65] that "the sum to be deducted must be the actual depreciation"; and it should also be noted that the court used the depreciation reserve only after the company had failed to meet the burden of proof of showing the actual depreciation. From Smith v. Illinois Bell Tel. Co. 282 U. S. 133, 51 S. Ct. 65, 75 L. ed. 255, it would seem that that court has not departed from its holding in Board of Public Utility Commrs. v. New York Tel. Co. 271 U. S. 23, 46 S. Ct. 363, 70 L. ed. 808.

It seems to us that the rule is now well established that the depreciation reserve is not to be so deducted. Southern Bell Tel. & Tel. Co. v. Railroad Comm. (D. C.) 5 F. (2d) 77; Monroe G. & F. Co. v. Michigan P. U. Comm. (D. C.) 292 F. 139; Pacific Tel. & Tel. Co. v. Whitcomb (D. C.) 12 F. (2d) 279; affirmed, Denney v. Pacific Tel. & Tel. Co. 276 U. S. 97, 48 S. Ct. 223, 72 L. ed. 483; Michigan Bell Tel. Co. v. Odell (D. C.) 45 F. (2d) 180; City of Knoxville v. Knoxville Water Co. 212 U. S. 1, 10, 29 S. Ct. 148, 53 L. ed. 371. Railroad Comm. v. Cumberland Tel. & Tel. Co. 212 U. S. 414, 29 S. Ct. 357, 53 L. ed. 577, cannot be regarded as an authority to the contrary, as the opinion in that case indicates that the company was entitled to a fair return on its invested capital, undepreciated, rather than on the fair value of its property.

In any event our attention has not been called to any case holding that such procedure would be applicable where but a few units of a substantial plant are to be valued.

 A telephone company runs its own business. The commission supervises its management and has the statutory authority. Neither the commission nor the court is charged with the management of the appellant's exchange. Neither may, in the absence of a showing of mismanagement, substitute its business judgment for that of appellant's officers.

The court does not make rates. It is concerned only with whether a given rate is confiscatory. Rate-making power is not a judicial function but is a legislative function and necessarily implies a range of legislative discretion. Pacific G. & E. Co. v. City and County of San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. ed. 1075; Brooklyn Borough Gas Co. v. Prendergast (D. C.) 16 F. (2d) 615, 623, 624. The owner of the utility property establishes its policies as to the accumulation of a depreciation reserve. It would seem to be good business to do this. No doubt the commission desires it. Various parts of a telephone plant must be retired from service at some time and are subject to various hazards. Provision must be made to meet the losses occasioned by such retirements when they shall occur. These reductions reduce the amount of profits otherwise realized. Such business foresight has had judicial approval. Board of Public Utility Commrs. v. New York Tel. Co. 271 U. S. 23, 46 S. Ct. 363, 70 L. ed. 808; City of Knoxville v. Knoxville Water Co. 212 U. S. 1, 13, 29 S. Ct. 148, 53 L. ed. 371; New York Tel. Co. v. Prendergast (D. C.) 36 F. (2d) 54. Adequate provision should be made each year to meet the year's share of losses of this character, and it has been said that inadequate provision in the past does not justify an increase in the future provision. Galveston Elec. Co. v. City of Galveston, 258 U. S. 388, 42 S. Ct. 351, 66 L. ed. 678. Of course the principle upon which such conduct is based is to provide not only for the covering of depreciation from use and time, "but of minimizing, and only minimizing, future possible losses of any kind, from storm or fire to [or] changes of fashion." New York Tel. Co. v. Prendergast (D. C.) 300 F. 822, 824. A depreciation charge to reserve resembles a life insurance premium. It insures against losses and inevitable decadence. A telephone com-

pany, like any other public utility, must, at its peril, provide an adequate amount for depreciation.

The commission will not destroy the authority of ownership. The practice of a rate-making body to reduce what it considers an excessive depreciation reserve fund by making inadequate provision for the future depreciation has been condemned. Pacific Tel. & Tel. Co. v. Whitcomb (D. C.) 12 F. (2d) 279, 284. Yet the fact remains that the rate-making body may insist on a discontinuance of unreasonable and excessive charges to depreciation reserve.

The law contemplates much mutual understanding and appreciation between a telephone company and its patrons. The company's business is given a monopolistic character and is almost assured a reasonable return upon the value of its property, a protection not enjoyed by private business. The income is not large or speculative, but conservative and quite certain. On the other hand, the patron is protected from exorbitant rates. Acting under such definite relations, it would seem that such a company and its patrons could act in harmony. Perhaps the present legal machinery for adjusting rates is not adequate, certainly not perfect; but the responsibility rests with the legislature. The determination of the value of the property of a telephone company should be a simple problem; not a difficult one. The patrons are entitled to demand service, and the company must comply. It is entitled to just compensation; no more. Each wants and depends upon the other. The company is entitled to a fair and reasonable return upon the present value of its property used and useful in the public service. Brooklyn Borough Gas Co. v. Prendergast (D. C.) 16 F. (2d) 615, 623. As to the elements entering into the question of value see id. 624; Ohio Utilities Co. v. Public Utilities Comm. 267 U. S. 359, 45 S. Ct. 259, 69 L. ed. 656.

 The commission gave the rural companies credit in the sum of $1,229 as an offset against the value of the property and services which appellant gives and assigns to the switching services. This was upon the theory that the rural line companies are entitled to compensation for facilities furnished by them for the benefit and

use of the appellant. They claim that they have in this manner made a valuable contribution to the joint enterprise, for which they are entitled to compensation. Their claim must rest upon the theory that they are now paying for the use of the entire local exchange. In this they are in error. If not, appellant has an offset to their present claim and of the same type and character.

The amount of such award seems to have been based at least in part upon the claim that the average cost per message on rural lines is greater than the average cost per message on the city exchange lines. The complainants' expert gives his opinion that the physical connection between the rural companies and the local exchange is the equivalent of 100 subscribers for the latter. In other words, he suggests that if this connection were now terminated the exchange would lose 100 of its own patrons on its own lines. It may be so. It would also seem that the use of a rural phone would be less attractive if not connected with appellant's exchange.

This presents a novel situation. The law requires a local exchange for a reasonable compensation to permit physical connection. It also authorizes the commission, in cases where telephone companies do not agree, to order this to be done and prescribe "reasonable conditions and compensation therefor."

Undoubtedly there are cases where the physical connection with the rural companies must be regarded as beneficial to the exchange. We think it is here. Whether such physical connection is mutually beneficial or beneficial to one only or more beneficial to one than the other seems to be a matter for the commission to determine and to adjust, if it is to be adjusted at all, as within the "reasonable conditions" to be imposed. Apparently this element was never considered by the commission when the connection was here approved or authorized. We think, however, such connection is beneficial to both. Perhaps one gets a greater benefit than the other. Yet under the law that may not be important.

G. S. 1923 (1 Mason, 1927) § 5296, however, compels the local exchange to connect with the rural lines, but does not compel the rural lines to connect with the exchange. It also provides compen-

sation for the exchange company, but not the other way around. But that is simple. The rural lines need the exchange more than it needs them. It has something, namely, a switchboard, which the rural lines do not have. They want the resulting benefits. They bring some benefits. The connection requires the use of the facilities of the exchange and its operators. It could not be compelled to make this contribution gratuitously. The statute provides that compensation shall be paid therefor. We have indicated what the service and contribution is that is here involved. Appellant furnishes certain property, not in a large amount, but something essential to make this physical connection complete and workable. That, together with the service involved, is what it is paid for. That particular contribution is what appellant gives for the six dollars per phone per year and which it is now ordered to furnish for three dollars. We think what the patrons pay for is quite definitely limited. It includes the necessary equipment for the lines of the rural companies to get through the switchboard. It also includes the operators on this position on the switchboard as well as other incidental matters involved. In our opinion the rate does not include or constitute a payment for the use of the wires radiating from the switchboard to the patrons of the exchange.

In addition to the things for which we say this compensation is made, appellant contributes the use of its lines in its entire exchange just the same as the rural companies contribute their equipment and for which they now seek a credit or offset against their recognized obligation to appellant. It seems to us that appellant is making a larger contribution of this character than the rural companies.

There may be cases where there may be some pecuniary advantage to one over the other to such an extent as to require action on the part of the commission "in fixing the reasonable conditions." We doubt it. If so, it goes to the propriety and advisability of making the connection under the appropriate requirement and condition to be imposed by the commission. It seems rather late for a claim of this character to arise after the connection has been made

and operation carried on for such a long time. It seems quite reasonable, however, to say that the statute contemplates that this element is to be furnished for the mutual benefit of the companies and for the public welfare. If the appellant is paid a reasonable compensation for the matter here involved, the mutual benefits resulting from the physical connection are of such character as to be of much benefit to the public and should be attractive to all the companies involved for the improvement of their service, in giving to their subscribers a larger contact with the public and to the latter improved opportunities for reaching all telephone users. Such physical connection seems to carry with it this benefit without adding any burdens materially affecting any of the companies involved. Telephone property must be considered in its relation to the public. It is owned by a company which is quasi public in character.

It certainly seems more desirable to a smaller company to be connected with a larger company than it is to a larger company to be connected with a smaller one. It also seems more desirable to persons living on farms to be connected to a switchboard with city lines than for city residents to have telephonic communication with the rural community.

The complainants' expert witness supports his contention by a mathematical process in this way: He says appellant's plant costs about $140,000 and the property of the rural companies costs about $70,000. He figures that it costs the exchange an average of .49 cents per message, whereas the average cost per message, he estimates, on the service station lines is 2.954, which is 2.464 cents greater than the average cost of handling a message on the exchange lines. It is estimated that each system passes about 89,000 calls to the other system in a year. The exchange has 3,400,000 calls a year entirely over its own lines, while the rural companies have 247,000 calls a year over their own lines.

Due to the fact that the city patrons use the phone so much more for talking among themselves than the rural subscribers do in talking among themselves, the cost per call over the rural lines is practically six times as great as the cost of carrying messages over the

town system. Instead of accepting calls from each other as an even trade, the claim is that the rural companies ought to charge appellant six times as much for the 89,000 calls received from it as appellant ought to charge the rural companies for the 89,000 calls coming the other way. This would result in about $2,199.86. But the commission allowed credit at $1,229. This theory does not seem sound. We cannot sustain it. Subscribers pay a flat price per phone. The use is unlimited. Moreover, on this basis the less the rural subscribers use their phones the more they can collect. The physical connection permits calls to be interchangeable between the two systems, and this fact is advantageous to the subscriber at each end of the line. It is no more advantageous to one than to the other as far as any individual patron's call is concerned. The direct benefit is to all subscribers. Any benefit that either the local exchange or the rural companies receive is an incidental one. They do not receive any additional rate from their patrons. It does not produce any direct or immediate monetary benefits. It may make their service more desirable. It therefore seems, particularly in view of the public welfare, from the fact that we are dealing with public utilities and the fact that such utilities are given practically a monopoly in their territory, to be fair for the appellant on the one hand and the rural companies on the other to exchange calls on an equal basis with no charge either way, and to disregard the fact that the subscribers on one system may make more or less calls than the other.

It was never the intention of the statute to have telephone companies pool their interests. Such physical connection calls for an adjustment. But when the exchange is compensated for its contribution as here involved, complete justice has been done. The rural companies were favored by the connection. That was the purpose of the law. The public was also favored thereby. Perhaps this legislation was for the public welfare. We think it was. The compensation provided for was to protect the exchange from a loss and to preserve its constitutional rights. The exchange was compelled to coöperate, and the rural companies were necessarily re-

544

quired to pay a fair compensation for the contribution from the exchange. Beyond this, any resulting benefit to either party is in excess of the elements for which appellant is so compensated; and it is an uncompensated service which a telephone company may well be required to give to the public as an incident to the monopolistic character of its business which our statute affords. It is not a burden for either or any telephone company, a party to switching service, to give this practical service, which is beneficial to it and which as a by-product is beneficial to the public. Such service is harmless. We all must submit to some private mischief which must be endured rather than to have a public inconvenience. This resulting beneficial service imposes no pecuniary burden, and it takes nothing away. The extraordinary powers and privileges given to quasi public corporations are given in consideration of benefits which it is to be presumed will be obtained by the public. Such benefits are primarily for the public. The theory is that the telephone company operating a local exchange should so connect, and as one of the offsets thereto or counteracting elements is the fact that it is practically protected from competition. The public and all parties hereto may gain, some more than others; but the fact is that such gain is without a loss to anyone. Such a duty may well be imposed upon a telephone company by law.

As here used, "public welfare" means that which is for the convenience of the public. Any business is affected with public interest when by law or legal authority it is given a virtual monopoly in its field or where the public adapt their business or conduct to the methods used by it. People v. Steele, 231 Ill. 340, 83 N. E. 236, 14 L.R.A.(N.S.) 361, 121 A. S. R. 321; City of Chicago v. Powers, 231 Ill. 560, 83 N. E. 240. Public welfare embraces several elements, including the economic interest, the promotion of economic welfare and public convenience. Pettis v. Alpha Alpha Chapter, 115 Neb. 525, 213 N. W. 835. "Public" in this sense means something which concerns the community at large, that which concerns a multitude of people. State ex rel. Freeling v. Lyon, 63 Okl. 285, 165 P. 419; State ex rel. Glenn v. Crockett, 86 Okl. 124, 206 P. 816. Regard for the public welfare is one of the highest laws.

Appellant does not ask the rural companies to pay for anything except that which it necessarily gives to complete the system of the rural companies.

15. The commission also deducted in the way of credit the sum of $105 "as the farm line proportion of profit derived from directory advertising." Appellant furnishes to the subscribers of the rural telephone companies two directories a year—nearly 1,000 books in all. These directories contain names and addresses of all subscribers in the local exchange and the rural lines. It charges neither the rural companies nor the rural subscribers for compiling, printing, addressing, or mailing these books; nor does it claim anything for this service in the amount claimed as reasonable for the switching services rendered. It makes a profit on each issue of the directories of about $571.74. It is assumed by the expert for complainants that the service stations are entitled to a proportion of this profit based upon the number of subscribers on service station lines as compared to the total number of subscribers served. He says the advertisers in the directory are fully as much interested in reaching the rural subscribers as any other subscriber. But this directory is built up on time belonging exclusively to the appellant. Its men solicit the ads. Its officials and employes put them together. It pays the printer. The directory is an incident to its business. The rural subscribers assume no responsibility therefor. They accept the book as a gratuity. Each book costs appellant about ten cents. Their use of the books may increase their value as an advertising medium. We do not, however, see any legal basis to support the holding that the rural subscribers are entitled to share or participate in the profits therefrom.

The matter of interest on rentals paid in advance seems to be an administrative question, which for the present we leave to the commission.

■ Appellant owns its local exchange, which as such is complete. As herein indicated, it appropriates some of its local system to the switching service here under consideration. It also owns toll lines entering into and occupying three positions on its switchboard.

Respondents claim that the toll lines should share in the maintenance depreciation and expense attaching to exchange and rural line plant facilities and overhead expense back of the switchboard, and reliance is put upon Smith v. Illinois Bell Tel. Co. 282 U. S. 133, 51 S. Ct. 65, 75 L. ed. 255. The findings of the commission do not go into details as to this item, and we are not certain as to their conclusion in reference thereto. Under the views herein expressed, it does not seem that the value of the toll line property and the amount of the revenue and the expenses attributable thereto, as well as the value of that portion of the local exchange devoted to the toll line service, is here material. That does not go to the issue involved. Whether the toll lines, which like the local exchange are owned by appellant, should carry part of the cost of maintaining telephone facilities and overhead expense back of the switchboard is not to the point; whether they should or not would not reach or in any way affect, as far as we can see, the amount which the patrons of the rural lines should pay for the switching service which they receive from the local exchange. Any exchange of use of lines between the toll lines and rural company lines is another uncompensated benefit furnished without cost and for the public good. Since the subject of this particular subcontroversy is not compensable, we need not consider or discuss what would be a proper method to determine the amount otherwise payable, nor a relative apportionment thereof.

Reversed.

OLSEN, JUSTICE, took no part.

STONE, JUSTICE (concurring).

I concur in the result, but would be better satisfied with a decision simply remanding the case to the district court for proper findings of fact—findings that would be ample and responsive to the determinative issues, particularly that of confiscation. The entire omission of such findings below puts us too much in the position of triers of the facts.