# IN RE APPLICATION OF ST. PAUL CITY RAILWAY COMPANY TO FIX RATES OF FARE. ST. PAUL CITY RAILWAY COMPANY v. CITY OF ST. PAUL.[1]

May 14, 1954.

Nos. 36,295, 36,296.

---

[1]Reported in 64 N. W. (2d) 487.

*Timothy P. Quinn,* Corporation Counsel, and *Marshall F. Hurley,* Assistant Corporation Counsel, for appellant.

*Carl W. Cummins, Cummins, Cummins, Hammond & Ames, Clarence O. Holten, James E. Dorsey,* and *Dorsey, Colman, Barker, Scott & Barber,* for respondent.

KNUTSON, JUSTICE.

The facts essential to an understanding of the issues involved in this appeal may be briefly stated. By its order of July 17, 1950, the railroad and warehouse commission of the state of Minnesota (hereinafter called the commission) established a permanent fare for the St. Paul City Railway Company (hereinafter called the company) of 15 cents cash, four tokens for 55 cents, with a ten-cent fare for school children. By its order of March 27, 1952, the rate was fixed at a straight 15 cents cash, with no change in the fare for school children.

On June 2, 1952, the company filed its petition for the establishment of—

"* * * a permanent rate of fare to be charged by your Petitioner for the carrying of passengers within the City of St. Paul and the City of South St. Paul, such rate of fare to be adequate and proper

to yield a fair return on the fair value of Petitioner's property; and that pending a final determination of such permanent fare by the Commission the emergency fare to be charged by your Petitioner as set forth in the order of the Commission herein dated March 27, 1952, be changed to be the sum of 20¢ cash with no reduction for token purchases, which emergency fare is immediately necessary to meet the vital requirements of passenger transportation by your Petitioner."

This petition came on for hearing on July 9, 1952, and thereafter at various dates up to and including September 30, 1952. A great deal of testimony was adduced at these hearings. On December 23, 1952, the commission issued its order which reads as follows:

"That effective at 12:01 A. M. on January 1, 1953, and until a further order has been issued in these proceedings, a temporary rate of fare to be charged by the St. Paul City Railway Company for the transportation of passengers within the City of St. Paul and the City of South St. Paul be authorized as follows:

"Cash fare, 20 cents a ride; token fare, 6 tokens for $1.00, each token good for one ride; High school and grade school student fare, 10 cents per ride; existing transfer privileges, intercity and suburban fares to remain as now in force.

"That until further ordered, the class depreciation rates charged by the Company shall be those set forth in Appendix C.

"This order shall continue in force until changed by a subsequent order of this Commission in this proceeding.

"That the matter of re-valuation of the Company's property and the fixing of a fare shall be brought on for hearing on September 1, 1953, unless prior thereto the Commission shall have determined from reports and operation data submitted to it that an earlier hearing should be held."

Thereafter on February 11, 1953, the company filed another petition for the establishment of an emergency fare alleging that the rates established by the order of December 23, 1952, had not produced sufficient revenue and that they were inadequate and confiscatory.

The petition alleged that the revenue passengers had decreased steadily and that operating costs, due principally to increases in wages, had increased. The prayer for relief was:

"* * * your petitioner prays that the proceedings in the above entitled matter be again reopened and that a hearing at as early a date as possible be fixed therefor for the purpose of establishing an emergency rate of fare, and requests that such emergency fare be established as follows:

"(a) That the present cash rate of 20¢ be not changed;

"(b) That the present school children's fare of 10¢ be not changed;

"(c) That the present token fare of 6 tokens for $1.00 be changed to a token fare of 5 tokens for 90¢, which emergency fare and change from the present fare is immediately necessary to meet the vital requirements of passenger transportation by your petitioner."

The petition further alleged:

"* * * The continuance of the present fare is in violation of the provisions of the Federal Constitution and of the Minnesota Constitution and is contrary to law. The order of December 23, 1952 contemplates an early reopening of this matter."

This petition came on for hearing jointly with a similar petition by the Minneapolis Street Railway Company on March 23, 1953. After further extensive hearings, the commission issued its order dated April 24, 1953, reading as follows:

"That effective at 12:01 A. M. on April 30, 1953, and until a further order has been issued in these proceedings, the rate of fare to be charged by The St. Paul City Railway Company for the transportation of passengers within the City of St. Paul and the City of South St. Paul be authorized as follows:

"Cash fare, 20 cents a ride; token fare, 5 tokens for 90 cents, each token good for one ride; high and grade school student fare, 10 cents per ride; existing transfer privileges, inter-city and suburban fares to remain as now in force.

"This order shall continue in force until superseded by a subsequent order of this Commission in this proceeding, as provided in the

Commission's December 23, 1952, order herein, provided that all other provisions of the order of December 23, 1952, shall remain in force and effect."

Appeals to the district court were taken from both the order of December 23, 1952, and the order of April 24, 1953, and the two appeals were consolidated for trial. After making findings of fact and conclusions of law, the trial court affirmed both orders. The appeal here is from an order denying a motion of the city of St. Paul (hereinafter called the city) for amended findings of fact, conclusions of law, and order for judgment or for a new trial.

In its determination, the commission did not make findings as to the fair value of the company's property or a reasonable rate of return thereon. On appeal, the trial court made findings on both questions.

At the outset, two things must be kept clearly in mind, and what we say here is applicable only insofar as both may be true. In the first place, the parties have stipulated that M. S. A. c. 220, the so-called Brooks-Coleman Act,[2] applies to both the bus and streetcar operations of the company as far as this proceeding is concerned. The commission and the trial court have proceeded on that theory, so we shall do so for the limited purpose of determining the issues raised by this appeal. In the second place, we are dealing here with the establishment of a temporary rate as that term is defined under the Brooks-Coleman Act.

The pertinent sections of the Brooks-Coleman Act are M. S. A. 220.10, which reads:

"The commission is hereby granted initial and exclusive power and authority upon hearing upon petition as provided by this chapter, to fix and establish rates of fare and charges by a street railway for carrying passengers, subject to the powers of the district court in case of appeal thereto, as hereinafter provided, which rates shall not yield to exceed a reasonable return on the fair value of the street railway property of any street railway."

---

[2]See, City of Duluth v. R. R. & W. H. Comm. 167 Minn. 311, 209 N. W. 10.

Section 220.11, which as far as material reads:

"Rates of fare and charges within any city shall be just, fair, and reasonable and shall be sufficient to yield only a reasonable return on a fair value of the street railway property of the street railway within such city."

Section 220.13, which reads:

"Any street railway or city may apply to the commission at any time to fix and establish hereunder rates of fare to be charged by such street railway for the carrying of passengers within such city and it shall be the duty of the commission upon application being made by petition, as provided by this chapter, to proceed with due diligence to examine and appraise the street railway property and to hear evidence submitted on behalf of the street railway or the city, and to fix and determine the fair value of such street railway property within such city and to fix and establish rates of fare to be charged by such street railway for carrying passengers within such city under and in accordance with the terms and requirements of this chapter, which rates established shall yield to the street railway a reasonable return on the fair value of its street railway property within such city as an operating system. In establishing any rate of fare the commission or the court upon appeal shall consider the fair value of the street railway property of the street railway within such city as an operating system, but no additional value shall be allowed for any franchise of the street railway. * * * The commission may on application of either any city or street railway establish after notice and hearing an emergency or temporary rate *pending a valuation of property and the establishment of a rate based thereon; provided, that no such rate shall continue in force or effect for a longer period than is reasonably necessary to make a valuation of the property and establish a rate base thereon.* The commission may at any time after notice and hearing change or cancel any such emergency rate. Thereafter the commission may, on its own initiative, and shall, upon the application of the city or the street railway from time to time make such investigation as to

any change in property value or cost of service as may be reasonably necessary and, after a full hearing as herein provided, make such order confirming existing rates or changing rates as may be just, to properly regulate rates of fare hereunder. The commission or council shall have the right at all times to inspect by itself or by its representatives, all the books, records, and accounts and street railway property of any street railway in any city." (Italics supplied.)

■ The city contends that the temporary or emergency rates established by the railroad and warehouse commission are unlawful for the reason that the commission failed to find and determine the value of the property used and useful in the business. The company, on the other hand, contends that it is not necessary to determine the value of the property in fixing a temporary or emergency rate. We do not fully agree with either contention.

In In re Applications to Fix Streetcar Rates of Fare, 228 Minn. 435, 441, 37 N. W. (2d) 533, 536, we held that temporary, as well as permanent, rates must yield a reasonable return on the fair value of the property used or useful in the business. We there said:

"* * * Next to be considered are the requirements conditioning the exercise of the power to fix emergency or temporary rates of fare. These are to be found in the numerous provisions of the statute mentioned above, to the effect that rates of fare fixed shall be such as to yield a reasonable return on the fair value of the street railway property, and in well-settled rules of constitutional law that rates must be sufficient to yield a reasonable return on the fair value of the utility's property *at the time* it is being used to serve the public * * * , and that not only permanent rates, but also temporary rates during the rate-making process, must yield such a reasonable return * * *. It follows necessarily that there may be both occasion and necessity to establish emergency or temporary rates pending the rate-making process. * * *

"The provisions of the statute for repetitious exercise of the rate-making process with the making of *a* valuation as an incident of each exercise thereof to obtain a base for the determination of the reasonableness of the rates to be fixed and for the fixing of

rates sufficient to yield a reasonable return on such valuation evince, in the light of constitutional requirements that emergency or temporary rates the same as permanent rates must yield such a return, an intention that the power to make valuations and to fix emergency or temporary rates pending the making of such valuations is of a continuing nature, to be exercised repeatedly as occasion may require."

The company is the only party involved which can claim that a rate is confiscatory. Emergency situations may arise when an immediate increase in rates becomes necessary in order to prevent the operation of the business at a loss. It is conceivable that, under such circumstances, the company would be willing for short periods of time, pending the fixing of a permanent rate, to accept a rate which would cover only the cost of operation. In that case, the value of the property would not be involved and no determination thereof would be necessary. An illustration of that rule is to be found in City of Bartlesville v. Corporation Comm. 82 Okl. 160, 163, 199 P. 396, 398, where the court said:

"The plaintiff's second ground for relief, that the temporary rate in question was made without finding the valuation of the company's property, is also untenable. In support of this contention counsel for plaintiff cites the case of Oklahoma City v. Corporation Commission, 80 Okla. 194, 195 Pac. 498, wherein it was held that the first essential in fixing rates is to determine the valuation of the property, and then to determine whether the rate is reasonable. We do not think this case is in point in the case at bar. The rule announced in that case is applicable where a reasonable return upon the investment is being sought by the public utility company. But this rule does not apply where, as in the case at bar, the commission by a temporary order is merely seeking to fix a rate that will pay operating expenses pending an application for a permanent increase of rates. Necessarily, before the commission can fix a rate for the purpose of allowing a reasonable return upon the entire investment of a public service company, valuation of the investment must be shown; but where the record shows an entire failure of the rate in

force to pay the operating expenses of the company, and the temporary rate is fixed to enable the company to continue its public duties pending an investigation, it would be unreasonable to require evidence of the value of the company's property before such an order could be made."

Substantially the same rule was applied in Oklahoma Gas & Elec. Co. v. Corporation Comm. 83 Okl. 281, 201 P. 505, where the proceeding involved a reduction in rates due to a reduction in the cost of fuel. There, also, the new rate did not involve any change in valuation, but the new rate was based entirely on a change in other factors involved in rate making.

If, however, the company insists on a rate sufficiently high to yield a reasonable return on the fair value of the property, as it has a right to do and as it has done by its petition in this proceeding, then it becomes essential that the fair value of the property be determined in order that there be some base upon which to compute such reasonable return. It is hardly conceivable that the standard of reasonable return on fair value can be applied unless the very foundation for application of the standard is known. That does not necessarily mean however that the same degree of accuracy should be required in fixing the fair value of the property for the purpose of fixing a temporary rate as for fixing a permanent rate. Fixing value for rate-making purposes has become a laborious and time-consuming process, often consuming not only months but years.[3] It is obvious that statutory bodies to whom the rate-making power is delegated are not required to await the final outcome of such lengthy proceedings before relief can be afforded to a utility company. To so hold would be to render nugatory entirely the provisions for fixing temporary rates. As a matter of fact, if that were the law, there would be no necessity for temporary rates at all, for the reason that when the actual values are determined a permanent rate can be fixed equally as expeditiously as a temporary rate. It would also mean that, during the lengthy proceedings usually in-

[3]See, for instance, Lenihan v. Tri-State Tel. & Tel. Co. 208 Minn. 172, 293 N. W. 601.

volved in fixing values of such complex property, the company in all probability would be operating at a loss, and it might even become hopelessly bankrupt to the detriment not only of the shareholders of the company but of the public as well. Such a construction of our laws would force upon the company a rule which might lead to confiscation of its property and leave it helpless to demand those rights to which we have held it is entitled. In order to prevent such results, some practical and expeditious method must be devised for quickly determining value adequate for fixing temporary rates even though it is untenable for fixing a permanent rate.

We believe that the trial court in this case has arrived at the correct solution of the problem. In 1925 the commission fixed the value of the company's property at approximately $16,000,000[4] as of January 1, 1924.[5] The company has filed regular reports, as it is required to do by law, showing additions, retirements, and depreciation annually charged. The evidence in the case before us shows that the commission again fixed the value of the property as of January 1, 1950, at $11,238,592. No one seems to have questioned or now questions the validity of either of those figures. The trial court took the latter figure as a starting point and, by adding additions and subtracting retired property and depreciation, arrived at a present value of $6,400,000. The city contends that this figure should be $5,500,000 but has failed to show why the court's finding is not substantiated by the evidence. We believe that it is and that the method used in determining it is proper and sufficient for fixing a temporary rate.

While this question has not heretofore come before us, it has been before courts of other states. Our attention has not been called to a single case supporting the city's view. In Chicago Rys. Co. v. City of Chicago, 292 Ill. 190, 202, 126 N. E. 585, 590, the court said:

"To sustain the judgment of the circuit court it is insisted that the commission had no authority to fix a temporary rate based

---

[4]See, City of St. Paul v. R. R. & W. H. Comm. 163 Minn. 274, 203 N. W. 972.

[5]See record in above case.

upon increased operating expenses, and could only make a change upon a full hearing and examination which would demonstrate what a permanent rate ought to be. So far as we have been informed, every court which has considered that question has decided to the contrary."

In Produce Terminal Corp. v. Illinois Commerce Comm. 414 Ill. 582, 595, 112 N. E. (2d) 141, 147, the Illinois court said:

"* * * That it is within the power of the Commission to authorize a change in rates without a full hearing and examination to determine the fair return on the fair value of the utility's property has been sustained by this court in Chicago Railways Co. v. City of Chicago, 292 Ill. 190 [126 N. E. 585]."

See, also, Omaha & Council Bluffs St. Ry. Co. v. Nebraska State Ry. Comm. 103 Neb. 695, 173 N.W. 690; City of La Crosse v. Railroad Comm. 172 Wis. 233, 178 N.W. 867; Muskogee Gas & Elec. Co. v. State, 81 Okl. 176, 186 P. 730.

In 1934 the legislature of the state of New York recognized the necessity for temporary rates pending lengthy rate hearings. By L. 1934, c. 287, the legislature adopted 47 McKinney's Consol. Laws of New York Ann., Public Service Law, § 114,[6] which is not substantially different from the provisions of M. S. A. 220.13 dealing

---

[6]"The commission may, in any such proceeding, brought either on its own motion or upon complaint, upon notice and after hearing, if it be of opinion that the public interest so requires, immediately fix, determine and prescribe temporary rates to be charged by said utility company pending the final determination of said rate proceeding. Said temporary rates so fixed, determined and prescribed shall be sufficient to provide a return of not less than five per centum upon the original cost, less accrued depreciation, of the physical property of said public utility company used and useful in the public service, and if the duly verified reports of said utility company to the commission do not show the original cost, less accrued depreciation, of said property, the commission may estimate said cost less depreciation and fix, determine and prescribe rates as hereinbefore provided.

"Temporary rates so fixed, determined and prescribed under this section shall be effective until the rates to be charged, received and collected by said utility company shall finally have been fixed, determined and prescribed."

with this subject, except that it goes farther and provides for a determination of value on a formula not unlike that which we adopt here. In Matter of Bronx Gas & Elec. Co. v. Maltbie, 271 N. Y. 364, 3 N. E. (2d) 512, the court of appeals had before it a case involving the validity of this provision of the New York law in a proceeding brought to reduce rates. In upholding the law, the court of appeals said (271 N. Y. 374, 3 N. E. [2d] 515):

"The Commission fixes a temporary rate pending the hearing. It is based upon the elements stated, which are not all of those required to fix a permanent rate. As before stated, this would be impossible, if we must consider in fixing a temporary rate all the elements required for the final rate; no temporary rate could ever be fixed. This also is self evident. Therefore, to meet these conditions the temporary rate is fixed, within reasonable limits, upon figures which can be with some exactness obtained from the books of the company, showing original cost or investment; and if finally, when the proceeding ends, the temporary rate is proved to have been too low, the utility must be permitted and authorized to charge enough for its service to make up the loss. The consumer must pay what he should have paid, and the only way to do it is to fix a rate high enough to make up this loss."

In construing the above statutory provisions, the New York court in Matter of Consolidated Edison Co. v. Maltbie, 300 N. Y. 196, 204, 90 N. E. (2d) 35, 38, said:

"* * * In making a temporary rate order, expedition and promptness and the ready availability of factual information are prime requisites. In other words, the argument runs, the legislature determined that, in computing temporary rates, reliance should be placed only upon the facts and figures readily disclosed by the company's books, since they had at least the virtue of definiteness in contrast to the uncertainty that would stem from the traditional use of speculative and varying expert opinion."

It is apparent that the commission must be vested with a rather wide discretion in fixing temporary rates, as long as they are tem-

porary rates and are not permitted to become permanent rates by inaction. We therefore hold that, where, as here, temporary rates are established and take into consideration a reasonable return on the fair value of the utility property, there must be a determination of fair value but that, for the purpose of establishing such temporary rates, a determination of value based on a valuation formerly established, plus additions and minus permissible retirements and depreciation, is sufficient.

It may well be that the difficulty in this case arises more from the abuse than the use of a temporary rate. It was never intended under the Brooks-Coleman Act that a temporary rate should become a permanent one. Neither was it intended that the proceedings for determination of a permanent rate could be abandoned or indefinitely deferred. It is clearly stated that the temporary rate should continue only pending the determination of a permanent rate. The act (§ 220.13) expressly and unequivocally states:

"* * * no such rate shall continue in force or effect for a longer period than is reasonably necessary to make a valuation of the property and establish a rate base thereon."

By its very nature a temporary rate must be based on factors which can be summarily determined or it would serve no useful purpose at all. Permanent rates, on the other hand, must be based on those factors established by the governing and applicable law. The only justification for relaxing the rules applicable to the determination of permanent rates is the fact that temporary rates are intended to continue only for a short duration and are necessary because of the exigencies of the case. Temporary rates, however, may continue only so long as there is a bona fide proceeding pending for a determination of a permanent rate. If such proceeding is abandoned, the temporary rate falls with it. It may be that the transition from streetcars to buses has presented some difficulties in determining a permanent rate. Those difficulties have now been eliminated by the complete conversion to buses, and it should now be possible to proceed without further delay with a determination of a permanent rate based on those factors and standards set up by the law appli-

cable to the type of business now operated. Unless that is done, there will be no justification for any longer upholding these temporary rates.

■ The first contention of the city is that the rate is unlawful, not because it is too high or too low but because the railroad and warehouse commission did not make findings as to the value of the company's property or the reasonable rate of return thereon. The solution to this question involves essentially a determination of the function of the trial court on appeal from an order establishing a rate and whether the court may determine the fair value of the property and reasonable return thereon if the commission fails to do so.

The statute relating to appeals under the Brooks-Coleman Act is much broader than under some other acts. Section 220.15, as far as material, reads:

"Any city or street railway may appeal from any order, ruling, or decision of the commission duly made after hearing to the district court of the county in which the city affected by any such order, ruling, or decision is located, and the appeal shall be taken and all proceedings thereunder had as provided for by sections 216.24 to 216.27 and 217.12 to 217.15 so far as the same may be applicable. Upon such appeal the matters involved therein shall be tried and determined by the court without a jury *in the same manner as though originally commenced therein,* provided that the findings and order of the commission shall be received in evidence upon such trial but the court shall in no event be bound thereby. * * * Upon any appeal the district court shall have jurisdiction of and try the whole matter in controversy including matters of fact as well as law and make findings upon all material facts and, in any case involving rates or the value of street railway property, find and determine the fair value of such property and what is a reasonable rate of return thereon, and affirm, modify, or reverse any order or finding of such commission as may be required by law. The judgment or any order of such court shall be certified to the commission and the commission shall thereupon modify, reverse, or put into effect its order or find-

ings so as to conform to the judgment, order, and findings of such court." (Italics supplied.)

It is clear that under this statute the trial on appeal is *de novo*. Not only does the statute provide for a trial *de novo*, but it expressly requires the trial court to find value and what is a reasonable rate of return regardless of what finding the commission may have made or have failed to make.

■ It is well settled that rate making is a legislative function. Steenerson v. G. N. Ry. Co. 69 Minn. 353, 72 N.W. 713; City of Duluth v. R. R. & W. H. Comm. 167 Minn. 311, 209 N.W. 10; Western Buse Tel. Co. v. Northwestern Bell Tel. Co. 188 Minn. 524, 248 N. W. 220.

The court on appeal does not fix a rate. In the City of Duluth case, the functions of the trial court on appeal from a rate-fixing order are clearly and adequately expressed. We there said (167 Minn. 313, 209 N. W. 11):

"* * * it is urged that in language too clear for construction the final determination of the rate is vested in the court, for the trial is de novo; the findings of the commission, though admitted in evidence, do not bind the court; the court shall try matters of fact as well as law; findings shall be made as to both the value of the property of the street railway and what is fair return thereon; and finally the commission must modify, reverse or put into effect its order so as to conform to the judgment, order and findings of the court. It however is to be noted that nowhere is the court required to fix or determine the rate. The court must make only two specific determinations of existing facts, namely, the fair value of the street railway property and what is a present fair return thereon. To be sure both are prime factors in fixing the future rate, but there are many others, such as operating expenses, overhead, uncertainties as to patronage, and fluctuation of values bearing upon both earnings and expenses.* * *

"* * * To give standing and authority to the rate to be fixed under the act in question, the lawmakers took pains to provide not only that the commission should hear, investigate and determine the

value and bearing of all the factors which go to make a fair rate for the future, but that on appeal the court shall independently on its own judgment and upon such evidence as may be adduced before it determine at least two of the main factors which enter into rate making—the value of the property of the street railway and what is a fair return thereon.

"The ultimate inquiry on the appeal from the order of the commission is whether the rate fixed by it is confiscatory or fair and reasonable. Obviously in so doing the court must determine the two prime facts referred to. Many other facts, such as the parties see fit to raise an issue about, may with propriety be considered as bearing upon the final question. It is also apparent, since an appeal lies to this court from a decision by the district court, that full findings of fact are properly made not only upon the two facts specified in the statute but upon all important factors that go to determine whether the fare fixed by the commission is in fact fair or confiscatory."

■ As we have said above, in fixing a rate the railroad and warehouse commission must be given some leeway, as any rate is more or less experimental in nature. There are many "ponderables" which may affect the ultimate impact of the rate upon the earnings of the company. A raise in rates may cause a decrease in patronage. Seasonal fluctuations in the number of patrons are likewise incapable of exact determination. It must be evident that the final result is determined not only by the rate but by the rate multiplied by the number of people who ride the conveyance. In view of these circumstances, under our statute and decisions the railroad and warehouse commission is governed by two limitations. The rate must be high enough to yield a reasonable return on the fair value of the property, used and usable in the business; and, on the other extreme, it may not be so high as to yield an unreasonable return.

When a rate is fixed, one of several things may occur. Both parties may acquiesce in the rate and take no appeal. That is particularly true if the rate is a temporary one, calculated to operate only for a comparatively short period of time. In that event, the

rate is effective regardless of what findings the commission has made. The company may appeal on the ground that the rate is so low as to be confiscatory, or the city may appeal on the ground that the rate is so high that it yields an unreasonable return on the value of the property of the company. The appeal is from the order fixing the rate. City of St. Paul v. R. R. & W. H. Comm. 163 Minn. 274, 203 N. W. 972. In either of the last two events the court, on appeal, is required by statute to make two essential findings of fact, namely, the fair value of the property and what is a reasonable rate of return. City of Duluth v. R. R. & W. H. Comm. 167 Minn. 311, 209 N. W. 10. Having made those findings, the court must then determine, on an appeal by the company, whether the rate is so low as to be confiscatory, or, on an appeal by the city, whether it is so high as to contravene the statutory limitation. It is the latter situation with which we are dealing here. The legislative mandate clearly requires the court to make findings of value and reasonable return regardless of the findings of the railroad and warehouse commission.

On an appeal such as we have here, it is only when the court finds that the rate is higher than is permissible under the law, after having made such findings, that the rate may be held to be unlawful. The case is tried *de novo,* and the findings of the railroad and warehouse commission become of little importance after an appeal has been perfected. The important question then is whether the rate is too high or too low, depending on which party is attacking it. We hold that it is incumbent upon the trial court, under the statute here involved, to make findings of fair value of the property and reasonable rate of return, regardless of what findings the commission may or may not have made.

■ The city next contends that the court's finding that the fair value of the property was $6,400,000 is not sustained by the evidence. We have already covered that claim. We hold that the evidence sustains the finding for the limited purpose of fixing a temporary rate. The dispute with respect to fair value seems to center on a proper determination of depreciation properly chargeable to the property. Apparently it is the city's position that de-

ductible depreciation should be limited to accrued depreciation normally represented by the depreciation reserve on the books of the company. Whether the depreciation reserve represents the actual depreciation or not becomes a question of fact. The court was not compelled to accept either the company's figures as to what constituted the allowable depreciation or those of the city. See, Matter of Consolidated Edison Co. v. Maltbie, 300 N. Y. 196, 90 N. E. (2d) 35, where substantially the same contention was considered. We believe that the court's findings in that respect are sufficiently sustained by the evidence. Here, again, for the limited purpose of establishing a temporary rate, the determination must of necessity be based more or less upon an estimate.

■ The court found that a rate which would yield not less than seven percent nor more than eight percent on the fair value of the property would be reasonable. The city contends that the rate should not yield more than six percent. The business involved is highly competitive. Buses and streetcars are in constant competition with private automobiles, taxis, and other forms of transportation. A rate which might be reasonable for a utility operating under a monopoly is hardly a guide to a reasonable rate in a more competitive business. There is evidence that much higher rates in this type of business would be reasonable. Even in a type of business operating under a monopoly, a rate substantially as high as this has been approved by agreement. See, Western Buse Tel. Co. v. Northwestern Bell Tel. Co. 188 Minn. 524, 248 N. W. 220.

We do not determine what would be a fair and reasonable return for a permanent rate. For the purpose of a temporary rate, the findings here are sustained.

■ The final contention of the city, and the one presenting the most doubtful aspect of the case, involves a charge made by the company for streetcar property retired from the business, including both rolling stock and buildings and equipment. In its transition from streetcars to buses, the company has been compelled to retire, at a considerable loss, much property not fully depreciated. The trial court correctly stated in its memorandum:

"It is so axiomatic that it needs no discussion that depreciation can be charged only on property which is included in the rate base, and that it does not include property other than such as is used and useful in connection with the public service of the carrier."

The company, pursuant to a permissive order of the railroad and warehouse commission, set up as an operating expense an amount representing 50 percent of the net losses from abandoned property, amortized over a period of ten years. The other 50 percent is charged to the surplus of the company. These losses cannot be capitalized or charged as operating expenses as a normal thing. The trial court concluded that, if it were not for such charge to expenses of operation, the company would have to pay a substantial part, if not all thereof, in federal and state income taxes and the same result would be reached by so increasing operating expenses in the form of taxes paid. To the extent of such tax savings, the court allowed the deduction.

The city's expert recognized the logic of this approach to the problem. While we are not prepared to say that this method furnishes the proper solution to the problem of disposing of the company's retired property, it does appear that, as far as the record before us is concerned, the city, as representative of the patrons of the company, has suffered no substantial loss. For that reason, we do not believe that the rate should be held invalid on account of such charges.

It might be said in passing that the company urges that we adopt a formula based on an operating ratio—that is a ratio of operating income to operating expenses—in determining whether the rate established is fair and reasonable without regard to the fair value of the property. It may be that the old formula based on a reasonable return on the fair value of the property used and usable has become obsolete, together with the streetcars, in fixing rates for motorbus transportation.[7] Whatever merit there may be in that argument is not for us to say. As long as rates are established under the Brooks-Coleman Act, the formula provided therein by the

[7] See, 37 Minn. L. Rev. 148.

legislature must be applied. Under that act, there is no provision for applying an operating-ratio formula. Whether that act has any application to a wholly motorbus operation we do not now determine. Neither do we determine whether an operating-ratio formula may be applied under any other statutory provision. If a new formula is to be applied, it is ordinarily for the legislature so to provide. Neither the commission nor the courts, in the rate-making process, have any liberty to ignore the standards set up by the legislature or to substitute a formula of their own, however meritorious such formula may be.

Affirmed.

[1]Reported in 64 N. W. (2d) 499.