STATE v. TRI-STATE TELEPHONE AND TELEGRAPH
COMPANY.
CITY OF ST. PAUL AND CITY OF SOUTH ST. PAUL,
INTERVENER-RESPONDENTS.[1]

February 24, 1939.

No. 31,572.

[1]Reported in 284 N. W. 294.

518

C. B. *Randall,* Ralph A. *Stone,* Tracy J. *Peycke,* F. E. *Randall,* and E. A. *Prendergast,* for appellant.

*William S. Ervin,* Attorney General, *David J. Erickson,* Deputy Attorney General, and *Eugene W. Reed,* for the State.

*John W. McConneloug* and *Louis P. Sheahan,* for intervener-respondent City of St. Paul.

*Walter T. Ryan,* for intervener-respondent City of South St. Paul.

GALLAGHER, CHIEF JUSTICE.

Appeal by the Tri-State Telephone and Telegraph Company from a judgment of the district court affirming an order of the railroad and warehouse commission of Minnesota reducing existing rates for exchange services within the St. Paul metropolitan exchange area.[2]

---

[2]These proceedings began August 15, 1929, upon an order of the railroad and warehouse commission (the commission) to the Tri-State Telephone and Telegraph Company (the company) to show cause why all its rates and charges should not be reduced. The company objected to proceeding under the order; the commission acquiesced and instead undertook a survey of the property of the company in the St. Paul metropolitan exchange area (the Area). Upon its culmination the commission initiated on February 15, 1932, "an investigation of the reasonableness of all schedules of exchange rates and charges maintained and collected" by the company in the Area. Hearings commenced April 5, 1932, and continued intermittently until December 19, 1934.

August 31, 1932, upon the petition of the city of St. Paul the commission made a temporary rate order with regard to exchange rates in the Area. The United States district court for this district restrained its enforcement by an interlocutory injunction September 16, 1932, which was made permanent January 30, 1935. 1932 Telephone Report 100.

Generally stated, the issues are (1) whether the findings of the commission as well as those of the district court constitute a denial of due process; and (2) whether the rates prescribed by the commission and approved by the district court are confiscatory.

*The Commission.*—Authority to investigate and regulate intrastate telephone rates is placed with the commission. 1 Mason Minn. St. 1927, §§ 4641, 5291. Rate making for the future is an inherently legislative act whether done by the legislature directly or by a subordinate or administrative body to which is delegated the duty of fixing rates in detail, and the orders of such tribunals command the same regard and are subject to the same tests as enactments of the legislature. Chicago & G. T. Ry. Co. v. Wellman, 143 U. S. 339, 12 S. Ct. 400, 36 L. ed. 176; City of Knoxville v. Knoxville Water Co. 212 U. S. 1, 29 S. Ct. 148, 53 L. ed. 371; Bluefield W. W. & I. Co. v. Public Service Comm. 262 U. S. 679, 43 S. Ct. 675, 67 L. ed. 1176; Arizona Grocery Co. v. A. T. & S. F. Ry. Co. 284 U. S. 370, 52 S. Ct. 183, 76 L. ed. 348. Being a legislative power, the rate-making power implies a range of legislative discretion which necessarily extends to the processes by which the legislative determination is reached. Los Angeles G. & E. Corp. v. Railroad Comm. 289 U. S. 287, 53 S. Ct. 637, 77 L. ed. 1180; St. Joseph Stock Yards Co. v. United States, 298 U. S. 38, 56 S. Ct. 720, 80 L. ed. 1033. Where that discretion is free to operate, its choice is uncontrolled by courts exercising supervisory jurisdiction. Dayton P. & L. Co. v. Public Utilities Comm. 292 U. S. 290, 54 S. Ct. 647, 78 L. ed. 1267.

*The Commission's Findings.*—An administrative body, even when

The commission's findings and its order fixing area exchange rates of approximately 25 per cent less than existing rates were entered March 31, 1936. An appeal to the district court was at once taken (1 Mason Minn. St. 1927, § 5308), and its decision was filed May 21, 1937. Judgment was entered August 10 of that year, and this appeal was taken the following month, enforcement of the judgment and order being stayed pending our decision under bonds aggregating $750,000.

The transcript of the testimony before the commission totals 6,848 typewritten pages; briefs before the commission, 979 pages; argument in district court, 1,090 pages; and briefs in this court, some 1,200 pages. There are also some 200 exhibits, many of which are of great size.

acting quasi judicially, is free of many of the procedural checks which circumscribe the action of a court. Interstate Commerce Comm. v. Louisville & N. R. Co. 227 U. S. 88, 33 S. Ct. 185, 57 L. ed. 431. While the commission must consider all competent evidence, and none that is incompetent, in making its decision (Morgan v. United States, 298 U. S. 468, 56 S. Ct. 906, 80 L. ed. 1288), the erroneous admission of evidence does not render the order invalid. N. P. Ry. Co. v. Dept. of Public Works, 268 U. S. 39, 45 S. Ct. 412, 69 L. ed. 836. Failure to follow the rules of judicial hearings does not violate due process so long as the substantial rights of the parties are protected. Tagg Bros. & Moorhead v. United States, 280 U. S. 420, 50 S. Ct. 220, 74 L. ed. 524. Reduced to its simplest terms, the purpose of a judicial inquiry into an administrative proceeding is to determine whether the substantial rights of the parties are invaded. Chicago & G. T. Ry. Co. v. Wellman, 143 U. S. 339, 12 S. Ct. 400, 36 L. ed. 176; Los Angeles G. & E. Corp. v. Railroad Comm. 289 U. S. 287, 53 S. Ct. 637, 77 L. ed. 1180; Dayton P. & L. Co. v. Public Utilities Comm. 292 U. S. 290, 54 S. Ct. 647, 78 L. ed. 1267.

The commission's obligation to make findings in rate proceedings is doubly apparent. To avoid the charge of unlawful delegation of authority to fix rates, the legislature must condition its exercise by the commission, and adherence to the statutory standards must appear in the record of the commission's act. M. & St. P. S. R. Co. v. Village of Birchwood, 186 Minn. 563, 244 N. W. 57; Wichita R. & L. Co. v. Public Utilities Comm. 260 U. S. 48, 43 S. Ct. 51, 67 L. ed. 124; Mahler v. Eby, 264 U. S. 32, 44 S. Ct. 283, 68 L. ed. 549; St. Louis & O'Fallon Ry. Co. v. United States, 279 U. S. 461, 49 S. Ct. 384, 78 L. ed. 798; United States v. C. M. St. P. & P. R. Co. 294 U. S. 499, 55 S. Ct. 462, 79 L. ed. 1023; A. L. A. Schechter Poultry Corp. v. United States, 295 U. S. 495, 55 S. Ct. 837, 79 L. ed. 1570, 97 A. L. R. 947. Due process demands that rates be fixed only after a hearing attended by at least the rudiments of fair play. The commission is in consequence required to base its decision upon the evidence and arguments disclosed at the hearing; its order must be supported by findings of fact which are

in turn sustained by the evidence. Interstate Commerce Comm. v. Louisville & N. R. Co. 227 U. S. 88, 33 S. Ct. 185, 57 L. ed. 431; West Ohio Gas Co. v. Public Utilities Comm. 294 U. S. 63, 55 S. Ct. 316, 79 L. ed. 761; Acker v. United States, 298 U. S. 426, 56 S. Ct. 824, 80 L. ed. 1257; Ohio Bell Tel. Co. v. Public Utilities Comm. 301 U. S. 292, 57 S. Ct. 724, 81 L. ed. 1093; Railroad Comm. v. Pacific G. & E. Co. 302 U. S. 388, 58 S. Ct. 334, 82 L. ed. 319.

Recitals in the order of submission to the statutory rules of procedure and decision are inconclusive; compliance with the legislative standard must be evident from the findings of the commission. Interstate Commerce Comm. v. N. P. Ry. Co. 216 U. S. 538, 30 S. Ct. 417, 54 L. ed. 608; Morgan v. United States, 298 U. S. 468, 56 S. Ct. 906, 80 L. ed. 1288. Likewise, in the case of due process the single finding that existing rates are unreasonable is a conclusion and insufficient unless supported by findings of fact more particularly stated which demonstrate the grounds upon which the conclusion is based so that the court may determine whether the order proceeds from a conscientious consideration of the evidence or is arbitrary. Western Buse Tel. Co. v. N. W. Bell Tel. Co. 188 Minn. 524, 248 N. W. 220; United States v. C. M. St. P. & P. R. Co. 294 U. S. 499, 55 S. Ct. 462, 79 L. ed. 1023; Ohio Bell Tel. Co. v. Public Utilities Comm. 301 U. S. 292, 57 S. Ct. 724, 81 L. ed. 1093.

Observance by the commission of the statutory prerequisites are not in question, but the company does contend that the findings[3] of that body are not sufficiently specific to satisfy due process. From the rules previously propounded, it follows that if the findings are sufficiently specific to permit a court sitting in review to determine

---

[3]The commission found that the company has operated a telephone system in the Area for more than 18 years; that the properties included in the valuation are those used by the company in rendering telephone service to the public situate within the Area, "not including, however, property primarily constructed and used for long distance toll service;" that the original cost, accrued depreciation, and depreciated original cost as of December 31, 1931, and December 31, 1933, are:

|      | 1931         |             |             |
|------|--------------|-------------|-------------|
| 1931 | $13,008,721  | $3,621,307  | $9,387,414  |
| 1933 | 13,158,007   | 3,970,770   | 9,187,237   |

whether or not the commission was influenced only by matters properly within its purview in reaching the result, then due process is satisfied. Findings need not be so particular that the manner in which every minute controversy was decided is displayed, for the purpose of review is to discover whether the legislative process has resulted in invasion of a legal or constitutional right and not to examine the manner in which disputes of every caliber were resolved. These rulings are collateral and while, if correct, they might tend to confirm the order, the order might yet be sustained although certain of them are wrong. Interstate Commerce Comm. v. Louisville & N. R. Co. 227 U. S. 88, 33 S. Ct. 185, 57 L. ed. 431; Virginian Ry. Co. v. United States, 272 U. S. 658, 47 S. Ct. 222, 71 L. ed. 463; Georgia Ry. & P. Co. v. Railroad Comm. 262 U. S. 625, 43 S. Ct. 680, 67 L. ed. 1144; Tagg Bros. & Moorhead v. United States, 280 U. S. 420, 50 S. Ct. 220, 74 L. ed. 524; Los Angeles

---

that the cost of reproduction new, the amount of accrued depreciation, and the cost of reproduction new less accrued depreciation as of the same dates are:

| | | | |
|---|---|---|---|
| 1931 | $12,060,149 | $3,452,871 | $8,607,278 |
| 1933 | 12,160,902 | 3,787,902 | 8,373,000 |

that the minimum gross earnings, the maximum operating expenses, and the minimum net earnings have been:

| | | | |
|---|---|---|---|
| 1928 | $ 3,791,191 | $2,174,518 | $1,616,673 |
| 1929 | 3,884,495 | 2,258,830 | 1,625,665 |
| 1930 | 3,891,791 | 2,301,885 | 1,589,906 |
| 1931 | 3,877,128 | 2,136,420 | 1,740,708 |
| 1932 | 3,668,275 | 2,049,882 | 1,618,393 |
| 1933 | 3,374,837 | 2,000,091 | 1,374,746 |

that a fair return upon its property is six per cent; that the fair value for rate-making purposes of its property during 1931 and 1933, and a fair return upon that value would be:

| | | |
|---|---|---|
| 1931 | $8,750,000 | $525,000 |
| 1933 | 8,500,000 | 510,000 |

that the actual rate of return under subsisting rates for 1931 was 19.89 per cent, and for 1933 was 16.17 per cent; that these rates are excessive and unreasonable, and that the schedule of exchange rates which are then set forth in the findings would yield a fair rate of return and would constitute reasonable and proper charges. The order decreeing that these rates be effective May 31, 1936, then follows.

G. & E. Corp. v. Railroad Comm. 289 U. S. 287, 53 S. Ct. 637, 77 L. ed. 1180; West v. Chesapeake & P. Tel. Co. 295 U. S. 662, 55 S. Ct. 894, 79 L. ed. 1640; American T. & T. Co. v. United States, 299 U. S. 232, 57 S. Ct. 170, 81 L. ed. 142.

The zone of propriety between the extremes of mere conclusion and undue particularity has never been accurately defined. It has been said that all of the essential facts upon which the order is based must be found. A. T. & S. F. Ry. Co. v. United States, 295 U. S. 193, 55 S. Ct. 748, 79 L. ed. 1382; Morgan v. United States, 298 U. S. 468, 56 S. Ct. 906, 80 L. ed. 1288. On the other hand, the commission is not obligated to display the weight given by it to any part of the evidence or to disclose the mental operations by which it reached its result. B. & O. R. Co. v. United States, 298 U. S. 349, 56 S. Ct. 797, 80 L. ed. 1209. A candid statement of the reasons and processes by which its findings are reached would be of assistance to the reviewing court, yet the commission is under no compulsion to expose its methods. Railroad Comm. v. Pacific G. & E. Co. 302 U. S. 388, 58 S. Ct. 334, 82 L. ed. 319. A bare finding of fair value without findings of historical cost and reproduction cost, accrued depreciation, and historical or reproduction cost less depreciation, will not suffice. Each of these items must be specifically found; a figure arrived at by offsets and comparisons without disclosing the sums compared or offset is not in accord with due process. Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas. 1916A, 18; West v. Chesapeake & P. Tel. Co. 295 U. S. 662, 55 S. Ct. 894, 79 L. ed. 1640; Petersburg Gas Co. v. City of Petersburg, 132 Va. 82, 110 S. E. 533, 20 A. L. R. 542.

While the commission cannot be charged with verbosity, it has made sufficient findings to demonstrate the essential basic facts from which its order proceeds. We hold that due process in this respect has been accorded. Prendergast v. New York Tel. Co. 262 U. S. 43, 43 S. Ct. 466, 67 L. ed. 853; Smith v. Illinois Bell Tel. Co. 282 U. S. 133, 51 S. Ct. 65, 75 L. ed. 255; St. Joseph Stock Yards Co. v. United States, 298 U. S. 38, 56 S. Ct. 720, 80 L. ed. 1033; United G. P. S. Co. v. Texas, 303 U. S. 123, 58 S. Ct. 483, 82 L. ed.

702; 19 Minn. L. Rev. 763. We are the more inclined to this view because of the absence of an application to the commission for more specific findings. C. & N. W. Ry. Co. v. Verschingel, 197 Minn. 580, 268 N. W. 2, 709; Ruud v. Minneapolis St. Ry. Co. 202 Minn. 480, 279 N. W. 224.

*The Court's Findings.*—The company asserts that the district court, when reviewing an allegedly confiscatory order of the commission, must weigh the evidence and determine the facts upon its own independent judgment and without the least regard to the findings of the commission. This view finds support in the case of Ohio Valley Water Co. v. Ben Avon Borough, 253 U. S. 287, 40 S. Ct. 527, 64 L. ed. 908 (see also Western Buse Tel. Co. v. N. W. Bell Tel. Co. 188 Minn. 524, 248 N. W. 220). Prior to this decision the judicial rule was that if the administrative findings of fact had legally adequate basis in the evidence the reviewing court was precluded from superseding those findings with its own. Interstate Commerce Comm. v. Louisville & N. R. Co. 227 U. S. 88, 33 S. Ct. 185, 57 L. ed. 431; Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas. 1916A, 18. Since the Ben Avon Borough case the United States Supreme Court appears to have receded from the position there taken; how far must be determined by a general review of the cases.[4]

In answering this contention we are confronted with the task of defining the boundary between the legislative and the judicial powers. It is agreed that the company is entitled to a judicial de-

[4]Ohio Valley Water Co. v. Ben Avon Borough, 253 U. S. 287, 40 S. Ct. 527, 64 L. ed. 908; Tagg Bros. & Moorhead v. United States, 280 U. S. 420, 50 S. Ct. 220, 74 L. ed. 524; Los Angeles G. & E. Corp. v. Railroad Comm. 289 U. S. 287, 53 S. Ct. 637, 77 L. ed. 1180; Georgia Ry. & P. Co. v. Railroad Comm. 262 U. S. 625, 43 S. Ct. 680, 67 L. ed. 1144; Bluefield W. W. & I. Co. v. Public Service Comm. 262 U. S. 679, 43 S. Ct. 675, 67 L. ed. 1176; Ohio Utilities Co. v. Public Utilities Comm. 267 U. S. 359, 45 S. Ct. 259, 69 L. ed. 656; Clark's Ferry Bridge Co. v. Public Service Comm. 291 U. S. 227, 54 S. Ct. 427, 78 L. ed. 767; St. Joseph Stock Yards Co. v. United States, 298 U. S. 38, 56 S. Ct. 720, 80 L. ed. 1033; West v. Chesapeake & P. Tel. Co. 295 U. S. 662, 55 S. Ct. 894, 79 L. ed. 1640; United G. P. S. Co. v. Texas, 303 U. S. 123, 58 S. Ct. 483, 82 L. ed. 702.

termination of the issue of confiscation (Dayton-Goose Creek Ry. Co. v. United States, 263 U. S. 456, 44 S. Ct. 169, 68 L. ed. 388, 33 A. L. R. 472; B. & O. R. Co. v. United States, 298 U. S. 349, 56 S. Ct. 797, 80 L. ed. 1209); that it is the duty of the court in passing upon that issue to make findings of fact (Western Buse Tel. Co. v. N. W. Bell Tel. Co. 188 Minn. 524, 248 N. W. 220); and that the rulings of the commission upon questions of law are without finality (Crowell v. Benson, 285 U. S. 22, 52 S. Ct. 285, 76 L. ed. 598).

As before stated, the rate-making power is legislative. The commission is informed by experience in its exercise and is specially constituted to weigh the evidence and determine the facts by which the exertion of the power is governed. In complex and delicate cases much weight attaches to its judgment. Interstate Commerce Comm. v. N. P. Ry. Co. 216 U. S. 538, 30 S. Ct. 417, 54 L. ed. 608; Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas. 1916A, 18; Crowell v. Benson, 285 U. S. 22, 52 S. Ct. 285, 76 L. ed. 598; American T. & T. Co. v. United States, 299 U. S. 232, 57 S. Ct. 170, 81 L. ed. 142. It is presumed, until the contrary is shown by clear and convincing proof, that the rates fixed by the commission are reasonable and just. Chicago & G. T. Ry. Co. v. Wellman, 143 U. S. 339, 12 S. Ct. 400, 36 L. ed. 176; City of Knoxville v. Knoxville Water Co. 212 U. S. 1, 29 S. Ct. 148, 53 L. ed. 371; Willcox v. Consolidated Gas Co. 212 U. S. 19, 29 S. Ct. 192, 53 L. ed. 382, 15 Ann. Cas. 1034, 48 L.R.A.(N.S.) 1134; Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas. 1916A, 18; N. P. Ry. Co. v. North Dakota, 236 U. S. 585, 35 S. Ct. 429, 59 L. ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1; Des Moines Gas Co. v. City of Des Moines, 238 U. S. 153, 35 S. Ct. 811, 59 L. ed. 1244; Banton v. Belt Line Ry. Corp. 268 U. S. 413, 45 S. Ct. 534, 69 L. ed. 1020; Los Angeles G. & E. Corp. v. Railroad Comm. 289 U. S. 287, 53 S. Ct. 637, 77 L. ed. 1180; B. & O. R. Co. v. United States, 298 U. S. 349, 56 S. Ct. 797, 80 L. ed. 1209; United G. P. S. Co. v. Texas, 303 U. S. 123, 58 S. Ct. 483, 82 L. ed. 702; Minneapolis Gaslight Co. v. City of Minneapolis, 123 Minn. 231, 143 N. W. 728.

The powers of the reviewing court are purely judicial and wholly lacking in legislative attributes. Its function is to protect constitutional rights, not to sit as a board of revision with appellate legislative authority to substitute its own judgment for that of the commission. Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas. 1916A, 18; S. P. O. & C. R. Co. v. Campbell, 230 U. S. 537, 33 S. Ct. 1027, 57 L. ed. 1610; N. P. Ry. Co. v. North Dakota, 236 U. S. 585, 35 S. Ct. 429, 59 L. ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1; Prendergast v. New York Tel. Co. 262 U. S. 43, 43 S. Ct. 466, 67 L. ed. 853; Pacific G. & E. Co. v. City and County of San Francisco, 265 U. S. 403, 44 S. Ct. 537, 68 L. ed. 1075; Los Angeles G. & E. Corp. v. Railroad Comm. 289 U. S. 287, 53 S. Ct. 637, 77 L. ed. 1180; St. Joseph Stock Yards Co. v. United States, 298 U. S. 38, 56 S. Ct. 720, 80 L. ed. 1033; American T. & T. Co. v. United States, 299 U. S. 232, 57 S. Ct. 170, 81 L. ed. 142. This does not mean that the findings of the commission are conclusive upon the courts. Interstate Commerce Comm. v. Louisville & N. R. Co. 227 U. S. 88, 33 S. Ct. 185, 57 L. ed. 431; Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas. 1916A, 18. The judicial power authorizes courts to inquire into the legal sufficiency of the evidence in support of administrative findings and to declare void an order where the findings are without basis in the evidence or are based upon evidence inadequate as a matter of law. Interstate Commerce Comm. v. N. P. Ry. Co. 216 U. S. 538, 30 S. Ct. 417, 54 L. ed. 608; Norfolk & W. Ry. Co. v. Conley, 236 U. S. 605, 35 S. Ct. 437, 59 L. ed. 745; Ohio Utilities Co. v. Public Utilities Comm. 267 U. S. 359, 45 S. Ct. 259, 69 L. ed. 656; Banton v. Belt Line Ry. Corp. 268 U. S. 413, 45 S. Ct. 534, 69 L. ed. 1020. But courts may not resolve conflicting evidence or pass upon the credibility of witnesses. Interstate Commerce Comm. v. Louisville & N. R. Co. 227 U. S. 88, 33 S. Ct. 185, 57 L. ed. 431; Tagg Bros. & Moorhead v. United States, 280 U. S. 420, 50 S. Ct. 220, 74 L. ed. 524; Crowell v. Benson, 285 U. S. 22, 52 S. Ct. 285, 76 L. ed. 598; St. Joseph Stock Yards Co. v. United States, 298 U. S. 38, 56 S. Ct. 720, 80 L. ed. 1033; United G. P. S. Co. v. Texas, 303 U. S. 123, 58

S. Ct. 483, 82 L. ed. 702; Railroad Comm. v. Pacific G. & E. Co. 302 U. S. 388, 58 S. Ct. 334, 82 L. ed. 319.

The company concedes that where compliance with a statutory standard is in issue the findings of the commission are conclusive if justified by adequate evidence, but contends that where confiscation is alleged the court must make findings entirely insulated from those of the commission. Crowell v. Benson, 285 U. S. 22, 52 S. Ct. 285, 76 L. ed. 598, and B. & O. Ry. Co. v. United States, 298 U. S. 349, 56 S. Ct. 797, 80 L. ed. 1209, give some support to this proposition.

This question was before the United States Supreme Court in St. Joseph Stock Yards Co. v. United States, 298 U. S. 38, 56 S. Ct. 720, 80 L. ed. 1033. That case involved an action by plaintiff company to restrain the secretary of agriculture from enforcing an order fixing maximum rates for the company's service under the authority of the provisions of the Packers and Stockyards Act, 1921 (42 St. 159, 7 USCA, §§ 181-229). There, as in this case, was involved the scope of judicial review of the issue of confiscation and the preliminary question as to whether the trial court had failed to exercise its independent judgment on the facts. In that case the trial court had expressed the view that even though the issue was one of confiscation the court was bound to accept the findings of the secretary if they were supported by substantial evidence and that it is not within the judicial province to weigh the the evidence and pass upon the issues of fact. The United States Supreme Court referred to the distinction between action within the sphere of legislative authority and action which transcends the limits of legislative power. It pointed out that whether the action be by the legislature itself or by an agency appointed by it, the findings of fact are conclusive provided the requirements of due process are met by according a fair hearing and acting upon evidence and not arbitrarily, and that in such case the judicial inquiry into the facts goes no further than to ascertain whether there is evidence to support the findings. The court then proceeded to review the principles applicable when the issue of due process or the taking of private property for public use without just compen-

sation is involved. Mr. Chief Justice Hughes speaking for the court said (298 U. S. 51-54) :

"But the Constitution fixes limits to the rate-making power by prohibiting the deprivation of property without due process of law or the taking of private property for public use without just compensation. When the legislature acts directly, its action is subject to judicial scrutiny and determination in order to prevent transgression of these limits of power. The legislature cannot preclude that scrutiny and determination by any declaration or legislative finding. Legislative declaration or finding is necessarily subject to independent judicial review upon the facts and the law by courts of competent jurisdiction to the end that the Constitution as the supreme law of the land may be maintained. Nor can the legislature escape the constitutional limitation by authorizing its agent to make findings that the agent has kept within that limitation. Legislative agencies, with varying qualifications, work in a field peculiarly exposed to political demands. Some may be expert and impartial, others subservient. It is not difficult for them to observe the requirements of law in giving a hearing and receiving evidence. But to say that their findings of fact may be made conclusive where constitutional rights of liberty and property are involved, although the evidence clearly establishes that the findings are wrong and constitutional rights have been invaded, is to place those rights at the mercy of administrative officials and seriously to impair the security inherent in our judicial safeguards. That prospect, with our multiplication of administrative agencies, is not one to be lightly regarded. It is said that we can retain judicial authority to examine the weight of evidence when the question concerns the right of personal liberty. But if this be so, it is not because we are privileged to perform our judicial duty in that case and for reasons of convenience to disregard it in others. The principle applies when rights either of person or of property are protected by constitutional restrictions. Under our system there is no warrant for the view that the judicial power of a competent court can be circumscribed by any legislative arrangement designed to give

effect to administrative action going beyond the limits of constitutional authority. This is the purport of the decisions above cited with respect to the exercise of an independent judicial judgment upon the facts where confiscation is alleged. The question under the Packers and Stockyards Act is not different from that arising under any other act, and we see no reason why those decisions should be overruled.

"But this judicial duty to exercise an independent judgment does not require or justify disregard of the weight which may properly attach to findings upon hearing and evidence. On the contrary, the judicial duty is performed in the light of the proceedings already had and may be greatly facilitated by the assembling and analysis of the facts in the course of the legislative determination. Judicial judgment may be none the less appropriately independent because informed and aided by the sifting procedure of an expert legislative agency. Moreover, as the question is whether the legislative action has passed beyond the lowest limit of the permitted zone of reasonableness into the forbidden reaches of confiscation, judicial scrutiny must of necessity take into account the entire legislative process, including the reasoning and findings upon which the legislative action rests. We have said that 'in a question of ratemaking there is a strong presumption in favor of the conclusions reached by an experienced administrative body after a full hearing.' Darnell v. Edwards, 244 U. S. 564, 569, 37 S. Ct. 701, 703, 61 L. ed. 1317. The established principle which guides the court in the exercise of its judgment on the entire case is that the complaining party carries the burden of making a convincing showing and that the court will not interfere with the exercise of the rate-making power unless confiscation is clearly established. Los Angeles Gas Corp. v. Railroad Commission, 289 U. S. 287, 305, 53 S. Ct. 637, 77 L. ed. 1180; Lindheimer v. Illinois Telephone Co. 292 U. S. 151, 169, 54 S. Ct. 658, 78 L. ed. 1182; Dayton Power & Light Co. v. Public Utilities Comm'n. 292 U. S. 290, 298, 54 S. Ct. 647, 78 L. ed. 1267. * * *

"* * * It follows, in the application of this principle, that as the ultimate determination whether or not rates are confiscatory ordinarily rests upon a variety of subordinate or primary findings

of fact as to particular elements, such findings made by a legislative agency after hearing will not be disturbed save as in particular instances they are plainly shown to be overborne."

The court concluded that the district court, despite its observations as to the scope of review, apparently did pass upon the evidence, make findings of its own, and adopt findings of the secretary. It was held that because independent judgment was thus exercised by the trial court it was unnecessary to remand the cause to that court for further consideration.

Appellant complains that the trial court in the instant case adopted, in some instances, the findings and conclusions of the commission instead of making its own based on its independent judgment. Isolated statements contained in the decision, in part, justify the criticism. But one cannot read the entire decision without reaching the conclusion that the trial court did apply its independent judgment to the findings and conclusions, at least to the extent of complying with the exactions required by the United States Supreme Court in St. Joseph Stock Yards Co. v. United States, *supra.*

The trial court in its statement of the process by which it arrived at its decision referred to this case and to Western Buse Tel. Co. v. N. W. Bell Tel. Co. 188 Minn. 524, 248 N. W. 220, thus indicating its familiarity with the rules involved and its intentions to apply them.

We believe, as did the United States Supreme Court in St. Joseph Stock Yards Co. v. United States, *supra,* that the district court in this case regardless of its observations did pass upon the evidence and did make its own findings and conclusions. For that reason we did not deem it necessary to remand the case to that court for further consideration.

*Confiscation.*—By an intricate series of inferences and surmises, indulged in also by the parties, the district court demonstrates the precise action taken by the commission upon every item influencing the conclusions by it reached. Since the attitude of the commission was fair and its findings derived from the evidence adduced at the

hearing, we are not required to follow the parties and the district court into an examination of the commission's conduct. Confiscation proceeds from the result reached, not from incidental errors made in reaching it. Our review is in consequence restricted to a determination of the conclusions which the evidence put in by the state will reasonably sustain. Cedar Rapids G. L. Co. v. City of Cedar Rapids, 223 U. S. 655, 32 S. Ct. 389, 56 L. ed. 594; West v. Chesapeake & P. Tel. Co. 295 U. S. 662, 55 S. Ct. 894, 79 L. ed. 1640.

Having devoted its property to the public service, the company is required to render service upon demand; it is entitled to reasonable compensation for the services so rendered because its property is as effectually confiscated by requiring its use for inadequate compensation as by a taking for less than its true worth. The just compensation assured a utility by the Fourteenth Amendment is a reasonable return on the value of the property at the time it is used in the public service. Rates which do not afford this return are confiscatory. While this is the aspect of the rule most often regarded, it is also true that the company's monopoly which is granted and protected by the state ought not to be exerted to the public detriment as a means of imposing oppressive rates. Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas. 1916A, 18; N. P. Ry. Co. v. North Dakota, 236 U. S. 585, 35 S. Ct. 429, 59 L. ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1; Banton v. Belt Line Ry. Corp. 268 U. S. 413, 45 S. Ct. 534, 69 L. ed. 1020; Board of Public Utility Commrs. v. New York Tel. Co. 271 U. S. 23, 46 S. Ct. 363, 70 L. ed. 808; Pacific T. & T. Co. v. Wallace, 158 Or. 210, 75 P. (2d) 942; Petersburg Gas Co. v. City of Petersburg, 132 Va. 82, 110 S. E. 533, 20 A. L. R. 542. If the company is permitted to exact whatever rate its own interest may dictate then the rate-making power is illusory. Conversely, if the power to regulate confers authority to decree charges suggested by caprice then the property is confiscated. The amendment demands that a middle course be charted and that the bargain between the public and the utility be fairly interpreted. Cedar Rapids G. L. Co. v. City of Cedar Rapids, 223

U. S. 655, 32 S. Ct. 389, 56 L. ed. 594; Des Moines Gas Co. v. City of Des Moines, 238 U. S. 153, 35 S. Ct. 811, 59 L. ed. 1244.

*History.*—In 1904, a time when the art of telephony had attained the dignity of a commercial venture and the industry was in the midst of a period of growth, the company entered the field. The era was one of unfettered competition. The strong attempted to expel from contested territory those less fortified financially by unceasing rate wars. Having destroyed opposition, the usual monopolistic evils—discriminatory and excessive rates, under-capitalization, and indifferent service—prevailed. This in turn caused exploited communities to invite invasion by new competing companies to furnish a check upon the victor, and the cycle was repeated. The company rapidly extended its system through virtually the entire state and early became the chief rival of the Northwestern Telephone Exchange Company (later the Northwestern Bell Telephone Company). The companies operated competing local exchanges in a large number of the principal cities and towns of the state, including St. Paul and Minneapolis.[5]

The era of unregulated competition terminated with the enactment of L. 1915, c. 152, which conferred upon the commission regulatory jurisdiction over intrastate telephone business. This act put a term to the existing disorder by imposing and enforcing fair competitive practices. The period of actual competition was also coming to a close. The necessities of the situation—the far greater investment required in the operation of a telephone plant because of the notable technical advances in the art, together with the better service and more economical operation feasible only through systematization—led to the consolidation and unification of duplicating plants through purchase or merger. To this the company and the Northwestern company finally resorted. By virtue of an

---

[5]See Re Complaint of Keenan, 1916 Tel. Rep. 41; Re Petition of City of Owatonna, 1917 Tel. Rep. 33; Re Redwood Falls Exchange Rates, 1918 Tel. Rep. 104; Re Purchase of Telephone Properties, 1918 Tel. Rep. 63. In 1918 the records of the commission disclosed that the investment in telephone properties in the state totaled $45,671,957, of which the two companies controlled approximately four-fifths. 1918 Tel. Rep. 6.

exchange, authorized by the commission, the company became the owner of all properties of the Northwestern company in St. Paul and the southern zone and surrendered to the Northwestern company all its properties in Minneapolis and the northern zone.[6] Since that time the company has been without a rival in the Area. During the years succeeding, the companies worked in close harmony under a licensing arrangement until 1933, when the Northwestern company acquired almost all of the outstanding capital stock[7] of the company so that its present status is one of membership in the Bell system.

*Fair Value.*—In deciding the question of fair return, a number of intermediate determinations must be made. Since fair return is computed with reference to fair value, the latter quantity must first be found. Willcox v. Consolidated Gas Co. 212 U. S. 19, 29 S. Ct. 192, 53 L. ed. 382, 15 Ann. Cas. 1034, 48 L.R.A.(N.S.) 1134. It is elementary that this may be less than, equal to, or more than present cost of plant less depreciation plus working capital. Denver Union Stock Yard Co. v. United States, 304 U. S. 470, 58 S. Ct. 990, 82 L. ed. 1469. In economic usage, value is equivalent to the price at which articles of the same kind are sold, or the amount arrived at through the capitalization of the earnings of the property according to the usual rate of return from such property. Neither measure may be applied here. A utility of this kind is constructed as an integrated unit to serve the convenience of a particular part of the public, not for sale, and in consequence so far as market value is concerned it has no resemblance to articles of commerce. West v. Chesapeake & P. Tel. Co. 295 U. S. 662,

---

[6]Concerning applications to purchase or merge properties during this period, see 1916 Tel. Rep. 6; 1917 Tel. Rep. 6; 1918 Tel. Rep. 6; 1919 Tel. Rep. 6; 1920 Tel. Rep. 6; 1922 Tel. Rep. 9. For reasons of economy and service motivating these applications, see these citations and orders generally entered in such proceedings. For order authorizing the transfer, see Re Purchase Telephone Properties, 1918 Tel. Rep. 63. Wages in 1918 were 21 per cent above 1915. Re Investigation of Rates, 1919 Tel. Rep. 85.

[7]Re Application for Consent to Transfer of Stock, 1932 Tel. Rep. 72; same case, 1934 Tel. Rep. 90; same case, 1934 Tel. Rep. 93; same case, 1934 Tel. Rep. 96.

55 S. Ct. 894, 79 L. ed. 1640. As to the second mode of computation, whether the present rate of return is proper is the purpose of the inquiry and so it is disqualified. Bauer and Gold, Public Utility Valuation, 21.

Fair value for rate-making purposes must therefore be determined in another way, and the indicia usually observed are historical cost, or cost of the original plant, plus additions, less retirements and accrued depreciation; reproduction cost as of the time of the inquiry, less accrued depreciation; the financial history of the company, and all other relevant facts. It cannot be determined with precision for it is not derived from the application of a formula, but must be reached through the exercise of a reasonable judgment, guided, but not ruled, by the results of the foregoing processes according to the weight, which depends upon the circumstances, attributable to each. Willcox v. Consolidated Gas Co. 212 U. S. 19, 29 S. Ct. 192, 53 L. ed. 382, 15 Ann. Cas. 1034, 48 L.R.A.(N.S.) 1134; Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas. 1916A, 18; Georgia Ry. & P. Co. v. Railroad Commrs. 262 U. S. 625, 43 S. Ct. 680, 67 L. ed. 1144; Bluefield W. W. & I. Co. v. Public Service Comm. 262 U. S. 679, 43 S. Ct. 675, 67 L. ed. 1176; McCardle v. Indianapolis Water Co. 272 U. S. 400, 47 S. Ct. 144, 71 L. ed. 316; Los Angeles G. & E. Corp. v. Railroad Comm. 289 U. S. 287, 53 S. Ct. 637, 77 L. ed. 1180; West v. Chesapeake & P. Tel. Co. 295 U. S. 662, 55 S. Ct. 894, 79 L. ed. 1640; Dayton P. & L. Co. v. Public Utilities Comm. 292 U. S. 290, 54 S. Ct. 647, 78 L. ed. 1267; Railroad Comm. v. Pacific G. & E. Co. 302 U. S. 388, 58 S. Ct. 334, 82 L. ed. 319; Western Buse Tel. Co. v. N. W. Bell Tel. Co. 188 Minn. 524, 248 N. W. 220; see State v. Penn Mut. L. Ins. Co. 198 Minn. 115, 269 N. W. 37. The fact that fair value for rate-making purposes is affected by these standards and is wholly indifferent to factors which enter into the determination of a price at private sale shows that fair value for rate-making purposes is quite divorced from ordinary market value. Galveston Elec. Co. v. City of Galveston, 258 U. S. 388, 42 S. Ct. 351, 66 L. ed. 678; In re Taxes of

Potlach Timber Co. 160 Minn. 209, 199 N. W. 968; Miles v. Public Service Comm. 151 Md. 337, 135 A. 579, 49 A. L. R. 1470.

*Property Included.*—Fair value in turn requires that the property which it represents be designated. To be included in the rate base, the property must be used or useful in the public service and must also be used to render one of the services of the same class as those the rates of which are under consideration.

The question is raised as to whether the evidence justifies the exclusion of certain properties for the reason that they are not used in furnishing telephone communication.[8] Property not used and useful may not be included in the rate base; this category embraces property once used but no longer used, as well as property used in but not reasonably necessary to the rendition of the service. Los Angeles G. & E. Corp. v. Railroad Comm. 289 U. S. 287, 53 S. Ct. 637, 77 L. ed. 1180; United G. P. S. Co. v. Texas, 303 U. S. 123, 58 S. Ct. 483, 82 L. ed. 702; Pacific T. & T. Co. v. Wallace, 158 Or. 210, 75 P. (2d) 942; see State v. N. W. Tel. Exch. Co. 84 Minn. 459, 87 N. W. 1131. Authority to regulate the plant does not contain the power to operate it. By undertaking to serve the convenience of the public, the company has submitted a large part of its conduct to public scrutiny; nevertheless it retains title to its property and must be granted the reasonable managerial discretion that ownership implies. It may not, of course, saddle the public with the consequences of its blunders (Steenerson v. G. N. Ry. Co. 69 Minn. 353, 72 N. W. 713), but where its action is reasonable the commission must recognize its validity. State v. G. N. Ry. Co. 135 Minn. 19, 159 N. W. 1089; N. P. Ry. Co. v. North Dakota, 236 U. S. 585, 35 S. Ct. 429, 59 L. ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1; Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Comm. 262 U. S. 276, 43 S. Ct. 544, 67 L. ed. 981, 31 A. L. R. 807; Banton v. Belt Line Ry. Corp. 268 U. S. 413, 45 S. Ct. 534, 69 L. ed. 1020.

---

[8]According to the state's reproduction costs, these items of land, station apparatus, station installations, pole lines, aerial cable and wire, underground conduits and tunnel, as well as underground cable, totaled $216,-545.52.

We find adequate support in the record for the conclusion that some of the property has been made useless by the reconstruction of the plant and that other properties may at some time in the future be put in service in the plant but should not now be included in the rate base. When its use is imminent although not actual, its value may be taken into account; but unused property held for future use need not be included in the rate base unless its term of service is so near commencing that it has a quality analogous to that of working capital. No formula is prescribed for the discovery of that quality, and it must be left to the trier of the facts within the limits of fair discretion and the light of the circumstances. Columbus G. & F. Co. v. Public Utilities Comm. 292 U. S. 398, 54 S. Ct. 763, 78 L. ed. 1327, 91 A. L. R. 1403; American T. & T. Co. v. United States, 299 U. S. 232, 57 S. Ct. 170, 81 L. ed. 142; see State v. N. W. Tel. Exch. Co. 96 Minn. 389, 104 N. W. 1086. The burden is on the company to demonstrate that unused property is within that category.

The station apparatus and installations were in temporary retirement because of the decline in subscribers and were imminently usable. Two parcels of excluded land ought also to be included as purchased and used in a reasonable exercise of managerial discretion.[9] As to the rest, the commission might reasonably reject them from consideration.

Property within the Area is used to furnish two general classes of service—exchange services and toll or long-distance services. Since exchange rates alone are under scrutiny here, only used and useful property devoted to exchange services ought to be included in the rate base. Property used solely for that purpose must be

[9]The station apparatus and installations constitute the equipment placed at the disposal of a subscriber; $40,676.58 are thereby restored to the rate base. Two of the lots owned by the company adjoin exchanges located in outlying commercial or residential zones; in view of the surroundings and small cost, $2,125, they should be allowed. A third lot valued at $46,500 adjoins the central office and is used only as a car lot; the commission might find that its ownership and use for that purpose is not reasonably necessary to the service.

included, and property exclusively used for toll must be excluded; property used to render both services must in some fashion be apportioned between them according to its employment in each service. Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas. 1916A, 18. Extreme nicety or mathematical precision in making the apportionment is not essential. Smith v. Illinois Bell Tel. Co. 282 U. S. 133, 51 S. Ct. 65, 75 L. ed. 255. Jointly used property was allocated by the state to toll or exchange according to its major use, and the revenues of that service were credited with rent compensation from the other.[9a] The company purported to apportion jointly used property according to proportionate use. The objection asserted by the company to the state's formula is that it assigns interurban service, and therefore interurban property, revenues, and expenses, to exchange rather than to toll.

Adjoining one side of the Area is the Minneapolis exchange area; within the Area and next to the Minneapolis area is the Midway district. Station-to-station calls from a station in the Area to a station in the Minneapolis area pass from the exchange board in the Area directly to the proper local exchange in the Minneapolis area. Person-to-person calls pass from the Area exchange board to the toll switchboard, and the connection is completed by this means.

[9a]The state contends and the evidence supports the conclusion that toll ought to be compensated for exchange use of toll property as indicated in column (1) and that exchange ought to be compensated for toll use of exchange property as indicated in column (2) for the following years:

|  | | (1) | (2) |
|---|---|---|---|
| 1928 | — | $15,638.00 | $29,220.00 |
| 1929 | — | 13,446.00 | 31,654.00 |
| 1930 | — | 12,750.00 | 32,867.00 |
| 1931 | — | 12,750.00 | 32,867.00 |
| 1932 | — | 12,750.00 | 32,867.00 |
| 1933 | — | 12,750.00 | 32,867.00 |

The district court did not include these items in arriving at gross income or gross expense because it felt that the commission had not included them in making its estimate. Because of their propriety, however, they are included in our estimates of gross income and gross expense as will appear from footnotes 18 and 19.

Subscribers in the Midway district may call any station in either area without extra charge, and, conversely, any subscriber in either area may call any station in the Midway district without extra charge; but a charge is made for a connection between a station in the Area but outside the Midway district and a station in the Minneapolis area. The state's method of allocation places person-to-person interurban calls among toll services and station-to-station connections among exchange services.

Between toll and exchange services there is no inherent distinction. What constitutes an exchange service is therefore determined by a definition dictated by convenience rather than indicated by any fundamental characteristic. The fact that an individual charge is made for each connection is at most a superficial distinction. The commission is clothed with wide legislative discretion in classifying services for rate making. N. P. Ry. Co. v. North Dakota, 236 U. S. 585, 35 S. Ct. 429, 59 L. ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1; Norfolk & W. Ry. Co. v. Conley, 236 U. S. 605, 35 S. Ct. 437, 59 L. ed. 745; St. Joseph Stock Yards Co. v. United States, 298 U. S. 38, 56 S. Ct. 720, 80 L. ed. 1033; In re Application of N. W. Bell Tel. Co. 164 Minn. 279, 204 N. W. 873. In this case the requirements of reality are met by this classification, for the service is rendered by property otherwise exclusively exchange and uses no property which would otherwise be classified as toll.

It is urged that to take this service from toll will reduce the return from toll below the level of substantial compensation. The company is entitled to a fair return on the property it devotes to toll service, but it is not entitled to earn it from services performed by other property. Its remedy, if such will be the result, is to apply for an increase in toll rates. Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas. 1916A, 18; N. P. Ry. Co. v. North Dakota, 236 U. S. 585, 35 S. Ct. 429, 59 L. ed. 735, L. R. A. 1917F, 1148, Ann. Cas. 1916A, 1; Norfolk & W. Ry. Co. v. Conley, 236 U. S. 605, 35 S. Ct. 437, 59 L. ed. 745; Banton v. Belt Line Ry. Corp. 268 U. S. 413, 45 S. Ct. 534, 69 L. ed. 1020.

It is also urged that the inclusion of interurban service in exchange services is unlawful because not so classified before this proceeding was brought and the notice of the investigation gave no warning of such contemplated action. Assuming that interurban service was formerly classified as toll,[10] the company was not entitled to have it forever remain so. In quasi judicial proceedings the commission cannot controvert its rules existing at the time of the matter examined, but in making rules for the future it may change existing rules with perfect freedom. Crookston Milling Co. v. G. N. Ry. Co. 185 Minn. 563, 242 N. W. 287; Arizona Grocery Co. v. A. T. & S. F. Ry. Co. 284 U. S. 370, 52 S. Ct. 183, 76 L. ed. 348. The service of a notice in a rate case is not to give the commission jurisdiction in the ordinary sense, because the company submitted itself to the jurisdiction of the commission when it undertook to furnish the public with telephone service. Unquestionably the commission could have introduced the matter to the proceeding by a supplemental order. Such an order is unnecessary; the company was perfectly aware that the state was relying upon this method of apportionment, and it had full opportunity to oppose it and to present valuations of its property based upon it. It chose not to do so. Its constitutional rights are not invaded. Tagg Bros. & Moorhead v. United States, 280 U. S. 420, 50 S. Ct. 220, 74 L. ed. 524; N. W. Bell Tel. Co. v. Nebraska State Railway Comm. 297 U. S. 471, 56 S. Ct. 536, 80 L. ed. 810; Steenerson v. G. N. Ry. Co. 69 Minn. 353, 72 N. W. 713; In re Application of N. W. Bell Tel. Co. 164 Minn. 279, 204 N. W. 873.

*Actual Cost.*—Historical cost, the worth of the property at the time it was devoted to the public service, may be greater or less than the value for rate-making purposes depending upon the cir-

---

[10]During the course of the general investigation of rates conducted by the commission following the Great War, the method of allocation applied in this case was developed. Re Investigation of Rates, 1919 Tel. Rep. 70; 1920 Tel. Rep. 279-293, 339. It was used by the company there. 1922 Tel. Rep. 8, 27, 161. The annual reports of the company at least until 1930 were also framed with reference to it.

cumstances attending the outlay and subsequent events. Of course the cost of a utility well planned and efficient in the public service is good evidence of its value at the time of its construction and continues to supply a measure of the value of the physical elements of the property so long as there is no change in the level of applicable prices. But even though an alteration in the general price level has occurred, actual experience, especially in a recent period, is a valuable check upon extravagant estimates. McCardle v. Indianapolis Water Co. 272 U. S. 400, 47 S. Ct. 144, 71 L. ed. 316; Los Angeles G. & E. Corp. v. Railroad Comm. 289 U. S. 287, 53 S. Ct. 637, 77 L. ed. 1180; Clark's Ferry Bridge Co. v. Public Service Comm. 291 U. S. 227, 54 S. Ct. 427, 78 L. ed. 767.

After the exchange of July 1, 1918, it appears that 60 per cent or more of the property owned by the company had been acquired from the Northwestern company; it appears also that the price paid the Northwestern company was measured by prices then prevailing, which were significantly in excess of the prices paid by the Northwestern company at the time of the installation of the property in the plant. Where figures were available, the state used actual cost at the time the property was installed in the plant, but for most items no such information was available. It follows that those parts of the plant still in service which were installed prior to 1922 when the purchased property was distributed among the various investment accounts are carried at a higher figure than actual cost at the time they were put in service. It is fairly inferable that, excluding land and buildings, at least half of the plant in service in 1918 had been retired at the time of the hearing, and that what remained was stated at figures higher than actual cost. It is also fairly inferable from the evidence that two-thirds of the plant, land and buildings excluded, has been installed since 1918. We may take judicial notice of the fact that prices prevailing in 1918 and thereafter fairly state the costs at the time of the valuations. Los Angeles G. & E. Corp. v. Railroad Comm. 289 U. S. 287, 53 S. Ct. 637, 77 L. ed. 1180. The company would be in

nowise prejudiced if the commission gave considerable weight to this factor.[11]

*Reproduction Cost.*—The company is entitled to a return upon any increment to the value of the plant since installation. Western Buse Tel. Co. v. N. W. Bell Tel. Co. 188 Minn. 524, 248 N. W. 220. The present value of the plant may be indicated in some degree by this method when the costs of its components may be found with reasonable certainty. Los Angeles G. & E. Corp. v. Railroad Comm. 289 U. S. 287, 53 S. Ct. 637, 77 L. ed. 1180. In applying this formula, however, it must constantly be remembered that the appearance of substance, given by the delusive exactitude of the re-

---

[11]The exhibits indicate that gross additions to the plant during the period 1919-1933 amounted to more than $12,000,000 and that the gross retirements during that period had a book cost of more than $7,000,000. The estimated book value as of December 31, 1918, was $8,756,343. The actual or book cost of the physical plant as fixed by (1) the company, (2) the state, and (3) the district court as of December 31, 1931, and December 31, 1933, is:

| 1931 | (1) | (2) | (3) |
|---|---|---|---|
| Physical Plant | $12,900,135 | $12,959,244 | $13,018,522 |
| Interest during Construction | 46,444 | 49,477 | 49,477 |
| Working Capital | 660,983 | .......... | 122,000 |
| Total | $13,607,563 | $13,008,721 | $13,189,999 |
| 1933 | | | |
| Physical Plant | $13,157,455 | $13,110,097 | $13,169,067 |
| Interest during Construction | 44,662 | 47,910 | 47,910 |
| Working Capital | 514,592 | .......... | 122,000 |
| Total | $13,716,709 | $13,158,007 | $13,338,978 |

The percentages of plant added and retired as stated in the text are designedly conservative because certain classes of property, notably property immediately pertaining to the subscriber's station, may appear several times during its service life as an addition or retirement of invested capital.

The difference between the figures for physical plant of the state and the district court is accounted for by the allowance of $40,676 for station apparatus and installations, $16,080 for right of way, and $2,913 in the land account. The evidence also requires that an additional $2,125 be put in the land account (see footnote 9).

sults, is wholly imaginative. It is but an attempt to estimate the cost of constructing a plant exactly like the present used and useful plant. This theory indulges in a number of unfounded assumptions. It is inconceivable that the present plant would suddenly cease to be, or that if it were not in existence other environmental circumstances affecting its form and value would be operative, or that the same plant would be built if reconstruction, immediate and complete, were possible. Even in this speculative venture, however, some contact with reality must be preserved, and estimates, even those of experts, must relate to things and conditions having counterparts in reality. Minnesota Rate Cases, 230 U. S. 352, 33 S. Ct. 729, 57 L. ed. 1511, 48 L.R.A.(N.S.) 1151, Ann. Cas. 1916A, 18.

Because of the different methods of apportionment adopted, no very convincing or instructive comparisons between the general results reached by the state and the company can be made.[12] As to the prices of the physical properties and the labor and other costs entering into their incorporation into the plant, there is much dispute. The disputes here range mainly about the material and labor cost assumptions underlying the estimates of the parties, although even the arithmetic employed is called in question. Beyond saying that the testimony of either party would have permitted the commission to arrive at the conclusions asserted by it to be correct, we are under no compulsion to follow either into a nice dissection

[12]Applying 1931 prices and costs to the inventory as of December 31, 1931, and adding to the amount so reached the actual cost of the net additions to the plant from that date to December 31, 1933, the reproduction costs new of the physical plant as of those dates was estimated by (1) the company, (2) the state, and (3) the district court to be:

|      | (1) | (2) | (3) |
|------|-----|-----|-----|
| 1933 | $12,148,283 | $12,147,484 | $12,320,699 |
| 1931 | 12,015,609 | 11,996,631 | 12,170,164 |

Included in the Company's figure (1) are unspecified amounts for organization expense and construction work in progress. The state (2) and the district court (3) make separate allowances for those items not contained in the above figures, but their estimates embrace unspecified amounts for general administrative expenses during construction as well as going concern value which the company assesses separately from physical plant.

of the other's methods so as to adjudicate to an absolute certainty the permissible totals. In certain instances neither party remains wholly within the realm of credibility.

The company calls in question the use by the principal state valuation witness of index numbers in arriving at the present cost of supplies and labor. These numbers state the comparative prices of the same property at different dates. The use of a general commodity index to translate original cost and subsequent additions into present value by its application to a conglomerate of assets has been disapproved. But where the index is built for a particular class of property and is applied to that property it has been found acceptable. West v. Chesapeake & P. Tel. Co. 295 U. S. 662, 55 S. Ct. 894, 79 L. ed. 1640. Indeed some of the computations of the company demonstrate that its results and those derived from the use of index numbers are very similar when the same elements and assumptions are considered.

The great difference[13] between the parties appears to lie in the amounts allowed for intangibles. Thus the sums allowed for omissions and contingencies are widely variant, as are allowances for organization expense, interest during construction, working capital, and going value. All of these matters are largely matters of opin-

---

[13]For these items the claims of (1) the company, (2) the state, and (3) the holding of the district court as of 1931 and 1933 are:

| 1931 | (1) | (2) | (3) |
|---|---|---|---|
| Physical Plant | $12,015,609 | $11,996,631 | $12,170,164 |
| Omissions and Contingencies | 352,262 | 50,000 | 100,000 |
| General Administrative Expenses | 991,407 | (See n. 12) | (See n. 12) |
| Organization Expense | (See n. 12) | 16,517 | 16,517 |
| Interest during Construction | 1,205,813 | 324,081 | 333,542 |
| Construction Work in Progress | (See n. 12) | 54,000 | 54,000 |
| Working Capital | 560,000 | . . . . . . . . | . . . . . . . . |
|     Employees Fund | . . . . . . . . | 15,000 | . . . . . . . . |
|     Working Cash | . . . . . . . . | 64,000 | . . . . . . . . |
|     Material & Supplies | . . . . . . . . | 122,000 | 122,000 |
| Going Value | 1,800,000 | (See n. 12) | (See n. 12) |
| Total | $16,925,091 | $12,642,230 | $12,796,224 |

ion rather than proof. The difficulty is to draw the line between legitimate estimate and mere conjecture.

The omissions and contingencies allowance is intended to take care of property omitted by mistake from the inventory and of expenses not taken into account. The inventory was thorough, errors of duplication of items are likely to occur, the estimates covering the expenses of installing property in the plant were most detailed. We are unable to say that the grant made by the court is arbitrarily insufficient. The like may be said of organization expense.

As to interest during construction, interest on the money invested in the plant prior to its coming into operation, the company carefully constructed its estimate on assumptions which may or may not be true; it is not, unfortunately, based on the experience of the company. At the time of the inquiry book cost amounted to but $50,000. This amount had accumulated since 1921; the amount previously charged for that expense is unknown. The amount of reconstruction which has taken place since 1921 is considerable, and the relatively small expense incurred because of interest during construction could well support the inference that the company has overstated the case, or that the larger part of the reconstructed plant was carried in the rate base throughout the construction period and no interest should be allowed in such case.

| 1933 | | | |
|---|---|---|---|
| Physical Plant | $12,148,283 | $12,147,484 | $12,320,699 |
| Omissions & Contingencies | 351,926 | 50,000 | 100,000 |
| General Administrative Expense | 992,920 | (See n. 12) | (See n. 12) |
| Organization Expense | (See n. 12) | 13,090 | 13,090 |
| Interest during Construction | 1,205,096 | 328,229 | 336,400 |
| Construction in Progress | (See n. 12) | 10,830 | 10,830 |
| Working Capital | 560,000 | ........ | ........ |
| Employees Fund | ........ | 7,350 | ........ |
| Working Cash | ........ | 64,000 | ........ |
| Materials & Supplies | ........ | 122,000 | 122,000 |
| Going Value | 1,800,000 | (See n. 12) | (See n. 12) |
| Total | $17,058,225 | $12,742,983 | $12,903,020 |

There is an element of value in an assembled plant with an established business earning money over one not thus advanced. This is self-evident. This element of value must be considered in determining the value of the property upon which the owner has a right to a fair return. Des Moines Gas Co. v. City of Des Moines, 238 U. S. 153, 35 S. Ct. 811, 59 L. ed. 1244; Denver v. Denver Union Water Co. 246 U. S. 178, 38 S. Ct. 278, 62 L. ed. 649; Los Angeles G. & E. Corp. v. Railroad Comm. 289 U. S. 287, 53 S. Ct. 637, 77 L. ed. 1180. But going value is not to be included in every valuation as a perfunctory addition. Dayton P. & L. Co. v. Public Utilities Comm. 292 U. S. 290, 54 S. Ct. 647, 78 L. ed. 1267; Columbus G. & F. Co. v. Public Utilities Comm. 292 U. S. 398, 54 S. Ct. 763, 78 L. ed. 1327, 91 A. L. R. 1403; St. Joseph Stock Yards Co. v. United States, 298 U. S. 38, 56 S. Ct. 720, 80 L. ed. 1033; Denver Union Stock Yard Co. v. United States, 304 U. S. 470, 58 S. Ct. 990, 82 L. ed. 1469. It need not be separately assessed, but may be entered by valuing the property in the light of that factor. The state did not make a separate allowance for this item but declared that it had made its valuation of the plant as an integrated system doing business and earning money. The evidence will support a finding that its valuation gives full consideration to going value. The company rests its finding of going value upon the sums needed to train personnel, advertising, and solicitation necessary to acquire its present subscription rate, and so forth. We do not regard its conclusions as wholly persuasive; there is nothing to indicate that many of these expenses were ever incurred or are likely to be continued.

The district court allowed $122,000 for working capital; this is entirely for materials and supplies on hand. No cash working capital was granted for the reason that the company is prepaid for the services rendered. The monthly income, it appears, adequately covers monthly expenses which are evidently not paid in advance.

We hold that the evidence supports a finding of reproduction cost of approximately the amount determined by the district court.

*Depreciation.*—Depreciation plays a double role in a rate-making proceeding. Because the company is entitled to a return on present fair value of its property, the degree of the new value of the property which has vanished since installation must be determined and deducted. Because the worth of depreciable property tends to diminish from the moment it is installed in the plant, and since the company is entitled to be reimbursed for the value of its property which is consumed in serving the public, it is reasonable to include in the rates an amount sufficient to recompense the company for the property so consumed in equal annual installments during its service life, thereby spreading the burden among all the subscribers in whose service it was used. This requires that the service life, the loss which will mature upon retirement (that is, original cost plus cost of removal less salvage), and therefrom the annual depreciation charges to be made, must be determined for each class of property. By the appropriate weighing of these figures the composite depreciation annuity for the plant may be computed. The amount of depreciation which has accrued to the property of the company in the past and the proper rate which will adequately recompense the company for its retirement losses in the future are in dispute.

The amounts given to the company through the depreciation annuity are credited upon receipt to the depreciation reserve, a surplus account. When property is retired from the plant its book value is deducted from the asset account in which it was carried, and the loss sustained by its retirement is deducted from the depreciation reserve. The amounts collected from the public for the depreciation reserve are not, in a utility where new capital is constantly being absorbed, segregated and carried in a fund but are at once reinvested in the plant.[14] It is apparent that when a plant

---

[14]The evidence will support the conclusion that for the company as a whole (1) the depreciation rates, (2) gross additions to the depreciation reserve, (3) the retirement rate, (4) the gross deductions from the depreciation reserve, and (5) the net balance of the system depreciation reserve for the following periods have been:

is new and retirements are infrequent, or when an established plant continues to grow by taking in more capital than is retired, that the yearly additions to the depreciation reserve will exceed over a period of years the annual deductions from the reserve. But in these cases, as well as in the case of a plant whose capital invest‑ ment over a period of years is static, there must be some relation established or equilibrium struck finally between additions to and deductions from the reserve. Eventually, over a span of years, addi‑ tions and deductions ought to offset each other while leaving in the reserve the amounts accrued during the initial years of operation when additions far exceeded retirements. Lindheimer v. Illinois Bell Tel. Co. 292 U. S. 151, 54 S. Ct. 658, 78 L. ed. 1182.

There must also be some relation between the amount in the de‑ preciation reserve and the amount of actual depreciation which has accrued. That is, the per cent of the actual cost of the book value of the property which has been collected from the public to offset losses anticipated from future retirements ought not to be wholly out of proportion with the per cent of depreciation which has al‑ ready overtaken the property. These percentages need not be equivalent, because seldom, if ever, does depreciation occur in equal annual installments. If the spread between the amounts is too

|           | (1)    | (2)          | (3)    | (4)        | (5)        |
|-----------|--------|--------------|--------|------------|------------|
| 1904-1912 | 2.18%  | $    924,540 | .57%   | $  241,101 | $  683,439 |
| 1913-1917 | 2.38   | 1,060,954    | 2.40   | 1,067,681  | *6,727     |
| 1918-1920 | 3.88   | 1,595,093    | 1.48   | 606,644    | 988,449    |
| 1921-1933 | 5.09   | 12,806,911   | 3.49   | 8,775,886  | 4,031,025  |

System Balance       $5,701,336

This sum was 26.84% of the 1933 book cost of depreciable property of the system as of 1933, $21,237,805. The yearly experience of the company as a whole during recent years has been:

|      |      |           |      |           |          |
|------|------|-----------|------|-----------|----------|
| 1928 | 5.10 | 1,026,412 | 2.52 | 506,868   | 519,544  |
| 1929 | 5.08 | 1,070,554 | 2.66 | 560,178   | 510,376  |
| 1930 | 5.11 | 1,127,601 | 6.27 | 1,384,587 | *256,986 |
| 1931 | 5.09 | 1,152,948 | 3.63 | 822,970   | 329,978  |
| 1932 | 5.11 | 1,163,484 | 2.81 | 641,189   | 522,295  |
| 1933 | 4.40 | 1,001,319 | 1.85 | 422,467   | 578,852  |

*Debit

large, however, inequity results. If, for instance, the percentage of book cost which has been returned to the company in the form of depreciation annuities is substantially in excess of the percentage of depreciation which has accrued to the property of the company, then in effect the depreciation annuity is a means by which the public is compelled to loan the company a substantial amount of money without interest, which the company is privileged to invest in its plant, and on which the public will be required to pay the company a fair return as well as additional depreciation annuities to compensate the company on its retirement, and so *ad infinitum*.[15]

The depreciation annuity advocated by the company adds each year a formidable increment to the depreciation reserve, which would seem, in the case of a long established company, wholly at odds with the increment to be expected from relatively small yearly net additions to invested capital. The rate put forward by the state appears to be adequate to meet average retirements and to provide a moderate increment, more nearly in relation to the annual increment to capital, to the reserve as well as preserving the large increment piled up during the years of expansion and re-construction. Similarly, in the case of accrued depreciation, the percentage confessed by the company is entirely out of proportion to the depreciation reserve which has been accumulated from past operations. This apparently arises in large part from the fact that the company based its estimate of accrued depreciation almost entirely upon visual inspection and in disregard of length of service, remaining service life, obsolescence, inadequacy, and so forth. The

[15]The evidence here indicates that the application by the company of its present annual depreciation rate, approximately 5 per cent annually of its current book value, has resulted in its reimbursement for about 47 per cent of the loss to be anticipated upon the retirement of its depreciable property. The company nevertheless contends that its property is to be valued for rate-making purposes at about 90 per cent of its original or reproduction cost. This percentage is not significantly at variance with that applied to the depreciation reserve in footnote 14 for the reason that the experience of the company illustrates that property retired does not represent a complete loss, as much of it has considerable exchange value.

state is charged with going to the other extreme and basing its estimate wholly upon straight line age-life depreciation, but we think that the evidence will bear the construction that the other factors which ought to be considered were given weight in the determination. We find that the commission might reasonably conclude that these rates and amounts were about as stated by the state.[16]

*The Rate Base.*—As has been pointed out, the actual or book cost of the used and useful plant is in many respects a good measure of fair value for rate-making purposes in this case. The book accounts reflect in most instances prices of the period 1918-1933. Those prices tend fairly to state the existing price levels at the time of the inquiry. Book cost may be discounted to some extent because it includes the expense to which the company was put to convert what were in 1918 two integrated telephone systems into a single integrated system and for the further reason that the expense of constructing the present used and useful plant as a unit would be measurably less, we may fairly infer, than the method of periodic piecemeal reconstruction that has been resorted to here. The objectionable features of reproduction cost new have been referred to; to them may be added the fact that it puts a premium upon obsolescence. It demands that the existing plant be recon-

---

[16]The evidence sustains the conclusion that a depreciation rate of 2.6% of the book cost of depreciable property would have met the loss sustained by the company through plant retirement for the period 1919-1930. Accruals to the reserve on account of Area exchange properties during the period is estimated at $6,455,894; the book cost of retirements during this period was $6,289,234; of this latter sum 54.21 per cent, or $3,409,139, was deductible from the reserve, leaving the sum of $3,046,755 as the net accrual to the reserve because of exchange property in the Area for the period. The accruals under a rate of 2.6% would have yielded $3,438,073, which would have exceeded the amount chargeable to the reserve by $28,934. The state and the district court adopted a depreciation annuity for the future of 2.73 per cent. This appears adequate to conserve the existing depreciation reserve and to permit the addition of a fair increment.

The district court and the state approve a finding that accrual depreciation amounts to about 30 per cent of the actual or reproduction cost new. This appears reasonable in the light of the evidence.

structed, and this would include replacement of obsolete equipment as well as the duplication of antiquated engineering, the present cost of which would be enhanced by the very fact that it is not currently used.

While the findings of the commission indicate that it was most restrictive in the allowances it made, there is nothing to indicate that its processes were arbitrary or other than incidentally erroneous. The district court made a comprehensive examination of the record and a most persuasive analysis of the facts. Its memorandum and findings evince that full consideration was given to every element affecting the rate base. We think that its conclusions demand great weight. It felt that the sum of $9,000,000 would not be too low but felt that an additional $500,000 should be included as a backlog or cushion to take care of unknown factors. We think that the provision it has made is reasonably adequate.[17]

*Revenues.*—But two major inclusions in revenues are disputed; these are moneys derived from interurban service and a charge which the state seeks to impose on toll of 25 per cent of toll revenues arising out of long-distance calls originating within the Area. The first amount may be dismissed from further consideration; since the property used to render interurban service may with propriety be included within the exchange rate base, its revenues may properly be included in exchange revenues.

The charge against toll is made to reimburse exchange for the use of apparatus at the subscriber's station and of facilities between the station and the toll switchboard in putting through a long-distance connection. The state arrived at this proportion of toll earnings by mere reference to certain court decisions which are

---

[17]The district court finds (1) undepreciated value, (2) condition per cent, (3) amount of depreciation, and (4) depreciated value, as follows:

| 1931 | (1) | (2) | (3) | (4) |
|---|---|---|---|---|
| Reproduction Cost New | $12,796,224 | 72.8% | $3,499,155 | $9,297,068 |
| Actual or Book Cost | 13,189,999 | 72.7 | 3,627,305 | 9,562,694 |
| 1933 | | | | |
| Reproduction Cost New | 12,903,020 | 70.5 | 3,836,909 | 9,066,110 |
| Actual or Book Cost | 13,338,978 | 70.3 | 3,979,517 | 9,359,461 |

alleged to sustain the allowance in that amount. City of Houston v. Southwestern Bell Tel. Co. 259 U. S. 318, 42 S. Ct. 486, 66 L. ed. 96. That case does not require such a finding but merely permits it where the evidence is adequate.

Under the state's plan of apportionment, the whole burden of providing, maintaining, and operating the facilities from the subscriber's station to the toll switchboard is cast upon exchange. The proportion of this cost attributable to use for long-distance calls may be borne in two ways. The cost may be included in the monthly subscription charge made and collected by exchange (the board-to-board formula), in which case the tolls collected for long-distance calls are made solely to compensate the company for toll facilities; or the subscription charge does not include the privilege of access to the toll switchboard (the station-to-station formula), in which case the toll charge includes the cost of the use of exchange facilities and exchange ought to be reimbursed therefor. The commission has authority to compel the company to employ one or other bases of apportionment as it deems just; it is limited only by the restriction that it may not establish toll rates on a board-to-board basis and exchange rates on a station-to-station basis. Pacific T. & T. Co. v. Wallace, 158 Or. 210, 75 P. (2d) 942.

While the commission is perfectly free to adopt either method, as the district court holds, and the station-to-station method appears at first glance the more equitable, yet the commission is not free to set the compensation from toll to exchange at any figure it chooses. The sum fixed must relate to the costs of the use. The commission would not be warranted by the evidence in accepting 25 per cent of the toll revenues as the proper amount, but it would be justified in making an allowance of 12½ per cent.[18]

*Net Income.*—Aside from the depreciation annuity which we have already treated as an incident of another topic, we are not called

[18]The gross income from exchange operations in the Area as estimated by (1) the company, (2) the state, (3) the district court, and (4) the findings of the district court adjusted by the addition of rent compensation for toll use of exchange property (see footnote 9a) and a reduction in the amount allowed for toll use of exchange facilities in long-distance calls, are:

upon to decide the right of the company to have certain other expenses, challenged by the state and disallowed by the district court as inapplicable in a proceeding to fix rates, included for the reason that confiscation will not be established even if they are allowed.[19]

We do not deem it necessary to discuss at length the items of expense asserted by the company, denied by the state, and disallowed by the commission and the court, which include pensions and relief, dues and donations, advertising and canvassing, rate case expense and general law expense, for the reason that even if all such items were allowed the result would not be affected so as to make the rate attacked in this proceeding confiscatory.

We do not consider it amiss, however, to say that the payment of pensions to superannuated employes is not only in accord with accepted sociological views but is also of definite, though indirect,

|      | (1) | (2) | (3) | (4) |
|------|------------|------------|------------|------------|
| 1928 | $3,587,634 | $3,820,412 | $3,791,191 | $3,754,171 |
| 1929 | 3,646,258  | 3,916,149  | 3,884,495  | 3,843,158  |
| 1930 | 3,655,625  | 3,924,658  | 3,891,791  | 3,850,989  |
| 1931 | 3,433,892  | 3,909,995  | 3,877,128  | 3,837,002  |
| 1932 | 3,298,713  | 3,701,142  | 3,668,275  | 3,640,321  |
| 1933 | 3,032,914  | 3,407,704  | 3,374,837  | 3,347,465  |

The allowance of 12½ per cent of gross toll charges on cable originating in the Area is based on the computation of one of the state's experts and a witness of the company.

[19]The year's expenses from exchange operations within the Area as estimated by (1) the company, (2) the state, (3) the district court, and (4) the amounts of the expenses attacked by the state as inapplicable in a rate case and disallowed by the district court, are:

|      | (1) | (2) | (3) | (4) |
|------|------------|------------|------------|----------|
| 1928 | $2,517,079 | $2,191,325 | $2,222,270 | $103,506 |
| 1929 | 2,561,687  | 2,273,543  | 2,293,796  | 97,184   |
| 1930 | 2,651,019  | 2,315,950  | 2,327,472  | 144,143  |
| 1931 | 2,524,322  | 2,150,485  | 2,164,019  | 149,188  |
| 1932 | 2,452,204  | 2,063,947  | 2,082,961  | 155,413  |
| 1933 | 2,338,594  | 2,016,268  | 2,033,046  | 152,437  |

The largest cause of difference between the company and the state and court arises out of the deduction by the state of about $300,000 yearly for excessive depreciation; this, of course, we have already discussed.

economic benefit to the subscribers. Within limits, expenditures for this purpose should be treated as an expense. In deciding whether a specific claim for allowance for payments for such purposes should be granted, the commission must necessarily give due consideration to the discretion exercised by the management in establishing a pension system. If the amounts are reasonable and are actually paid as pensions, or are allocated to a fund in pursuance of a feasible plan whereby it is assured that the sums so allocated will be used to pay pensions in reasonable amounts, allowance should be made. Consolidated Gas Co. of New York v. Newton (D. C.) 267 F. 231, 254; Kings County Lighting Co. v. Lewis, 110 Misc. 204, 230, 180 N. Y. S. 570, 587. The action of the commission respecting the amount, if any, that should be allowed for advertising and canvassing will generally be sustained unless arbitrary. See West Ohio Gas Co. v. Public Utilities Comm. 294 U. S. 63, 72, 55 S. Ct. 316, 79 L. ed. 761; Acker v. United States, 298 U. S. 426, 430, 56 S. Ct. 824, 80 L. ed. 1257. While dues and donations have been allowed in some cases (see West Ohio Gas Co. v. Public Utilities Comm. supra, at p. 76, 55 S. Ct. 316; New York & Richmond Gas Co. v. Prendergast [D. C.] 10 F. [2d] 167, 182; Brooklyn Borough Gas Co. v. Prendergast [D. C.] 16 F. [2d] 615, 623), some commissions have been affirmed in excluding such items. See Carey v. Corporation Comm. 168 Okl. 487, 492, 33 P. (2d) 788; Denver Union Stock Yard Co. v. United States, 304 U. S. 470, 482, 58 S. Ct. 990, 82 L. ed. 1469.

Reasonable amounts for rate case expenses are allowable where the utility prevails or the rates fixed by the commission are retroactive. West Ohio Gas Co. v. Public Utilities Comm. 294 U. S. 63, 55 S. Ct. 316, 79 L. ed. 761. Such expenses need not be allowed if the rates charged are found to be greater than are fair and reasonable. Scranton-Spring Brook W. Serv. Co. v. Public Service Comm. 119 Pa. Super. 117, 181 A. 77; Reno P. L. & W. Co. v. Public Service Comm. (D. C.) 298 F. 790, 800, P. U. R. 1923 E, 485, 499.

The commission fixed the fair rate of return at six per cent, and this the company does not oppose. A fair return on $9,000,000 would therefore be $540,000; the return from the marginal $500,000

added by the district court increases this sum by $30,000. The constitutional mandate against confiscation will not be disobeyed merely because the actual return is slightly below that amount. During the years reviewed, in only one would less than $570,000 be available had the proposed rates been in effect. This was in 1933, when operations were at the lowest ebb, and even under those conditions the return would have been approximately 5.4 per cent.[20] Confiscation is not so plainly demonstrated that we may reject the rates without a trial. The district court was of the opinion that a moderate increase in subscribers would increase the earnings to $750,000 and that this increase took place after 1933. The annual earnings for the period 1930-1932 show that this is not an unreasonable expectation. We may also know judicially that the reduction in rates will tend to swell further the number of subscribers, and that the probable effect will be to enhance the net revenues and to reduce the operating costs per station.

We are therefore of the opinion that the findings of the commission are sufficiently supported by the evidence to negate the charge that its action was arbitrary; further, we are of the opinion that the rates it prescribed are not confiscatory in effect.

The judgment appealed from is affirmed.

MR. JUSTICE STONE took no part in the consideration or decision of this case.

---

[20]The rate return from exchange operations in the Area is shown by years in the following table. Column (1) is from footnote 18, column (4); column (2) is the sum of columns (3) and (4) of footnote 19 plus rent compensation for the exchange use of toll property (see footnote 9a); column (3) is the net return under existing rates; column (4) is the net return adjusted to the new rates.

|      | (1)         | (2)         | (3)         | (4)       |
|------|-------------|-------------|-------------|-----------|
| 1928 | $3,754,171  | $2,341,414  | $1,412,757  | $770,337  |
| 1929 | 3,843,158   | 2,404,426   | 1,438,732   | 796,311   |
| 1930 | 3,850,989   | 2,484,365   | 1,366,624   | 724,224   |
| 1931 | 3,837,002   | 2,325,957   | 1,511,045   | 868,625   |
| 1932 | 3,640,321   | 2,251,124   | 1,389,197   | 746,777   |
| 1933 | 3,347,465   | 2,198,233   | 1,149,232   | 506,812   |

Mr. Justice Peterson, having been attorney general and counsel below, took no part in the consideration or decision of this case.